**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 14-cv-03420-PAB-NYW

ESMERALDO VILLANUEVA ECHON, JR.,
MARIBEL ECHON, and
JUSTIN ECHON,

       Plaintiffs,

v.

WILLIAM SACKETT, and
LEONIDA SACKETT,

       Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

Magistrate Judge Nina Y. Wang

      This civil action comes before the court on Plaintiffs' Motion for Summary Judgment [#106, filed May 1, 2017]. The Motion was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1), the Amended Order Referring Case dated August 28, 2015 [#46], and the memorandum dated May 2, 2017 [#107]. For the reasons set forth herein, this court respectfully RECOMMENDS that Plaintiffs' Motion for Summary Judgment be GRANTED IN PART and DENIED IN PART.

**BACKGROUND**

      Plaintiffs Esmeraldo Villanueva Echon, Jr., Maribel Echon, and Justin Echon (collectively, "Plaintiffs") assert the following claims against Defendants William Sackett ("Mr. Sackett") and Leonida Sackett ("Ms. Sackett") [1] (collectively "Defendants" or "the Sacketts"): (1) violation of the Fair Labor Standards Act ("FLSA"); (2) violation of the Colorado Minimum

_____

[1] Defendant Leonida Sackett is often referred to in the record evidence as "Nida."

Wage of Workers; (3) violation of the Colorado Wage Claim Act; (4) Breach of Contract; (5) Breach of Contract—Third Party Beneficiary Claim; and (6) Unjust Enrichment. [#1]. Additionally, Esmeraldo Echon, Jr. ("Esmeraldo Echon")[2] and Justin Echon assert a claim against the Sacketts for violation of the Trafficking Victims Protection Reauthorization Act. Plaintiffs allege that Defendants, who operate several businesses and manage a farm in Rocky Ford, Colorado, held them without pay in "debt bondage, requiring them to work on their crops and in their market, clean and maintain their rental properties, and perform various other jobs from 2011–2014." [#1 at ¶ 2]. The Sacketts, who are proceeding *pro se*, filed an Answer on March 18, 2015. [#11].

On April 23, 2015, the undersigned presided over a Scheduling Conference, [#16], and subsequently entered a Scheduling Order. [#17]. As discussed in previous orders, discovery in this action has been wrought with difficulties, including multiple discovery motions and conferences that resulted in attendant delays and orders compelling discovery and awarding fees. *See, e.g.,* [#73, #90]. The final version of the Scheduling Order set April 22, 2016 as the deadline to complete discovery, and May 20, 2016 as the deadline by which to file dispositive motions. *See* [#55]. The Parties then embarked on discovery.

As early as August 2015, Plaintiffs alerted the court that Defendants were not responding to any discovery requests in a substantive fashion. [#23, #27]. In response, Defendants insisted, "I have given them all that I have, any employment record that he keeps wanting does not exist. There was not any employment [sic] I did not employ any of them at any time." [#31 at 2]. Defendants also asserted that they did not have employees, and had not had any employees since approximately 2012. [*Id.* at 3]. On August 19, 2015, Plaintiffs filed their first Motion to Compel

---

[2] Plaintiff Esmeraldo Echon is at times referred to in the record as "Junior."

Discovery. [#32]. The court extended the deadline for Defendants to respond to no later than September 14, 2015, and reminded Defendants that they were required to follow the same rules of procedure that bind represented parties. *See* [#39]. On September 11, 2015, Defendants filed a document entitled, "Discovery," which appeared to be additional responses to some or all of Plaintiffs' Requests for Production. *Compare* [#32-2] *with* [#50]. At a hearing held October 1, 2017, this court granted the first Motion to Compel Discovery and ordered Defendants to respond to Plaintiffs' Interrogatories and Requests for Production no later than October 22, 2015. *See* [#52]. Defendants did not file an objection to this Order to the presiding judge, the Honorable Philip A. Brimmer.

On November 30, 2015, this court held a telephonic discovery conference to discuss the status of discovery responses. *See* [#59]. The court again advised Defendants of their duties to follow applicable rules regarding discovery, and that failure to do so could result in sanctions, including but not limited to default judgment. *See* [*id.*]. On December 4, 2015, Plaintiffs filed a second Motion to Compel Discovery, [#60], to which Defendants filed no response. By Order dated January 27, 2016, this court granted the second Motion to Compel Discovery in part, ordering Plaintiffs to respond to Interrogatory Nos. 1 (as limited) - 5, 7-16 and Requests for Production No. 2-4, 6, 8, 10, and 11, no later than February 9, 2016. *See* [#62]. Counsel for Plaintiffs took the depositions of Mr. Sackett and Mrs. Sackett while the Second Motion to Compel Discovery was pending. *See* [#104-21, #104-22].

Plaintiffs then filed a third Motion to Compel and for Sanctions on February 23, 2016. [#64]. On March 7, 2016, Defendants filed a response, docketed as a letter. *See* [#68]. On May 2, 2016, this court compelled Defendants to respond to the outstanding Interrogatories in narrative form. *See* [#73 at 7]. This court also granted sanctions in the amount of 50 percent of

the reasonable expenses associated with the third Motion to Compel, which resulted in an Order awarding $1,552.50. [*Id.*; #90].

The Parties' difficulties with respect to discovery culminated with Plaintiffs' fourth Motion to Compel Discovery, filed July 19, 2016, which sought a variety of sanctions including default judgment against Defendants, a request that the court designate certain matters and facts as established for the purpose of this action, and a request that the court preclude Defendants from introducing certain matters and facts at a later time in this litigation. *See* [#83]. On January 23, 2017, the undersigned recommended that the Motion be granted as to the court designating certain facts as established and precluding Defendants from introducing certain facts (to be determined in the context of summary judgment), and denied as to the request for default judgment. *See* [#91]. This court also recommended that the court set a new deadline for Plaintiffs to file a motion for summary judgment. [*Id.*] On February 24, 2017, Judge Brimmer accepted the recommendation and ordered Plaintiffs to file a motion for summary judgment on or before April 10, 2017. [#92]. Judge Brimmer specified that the court would address in further detail at a later date the matters to be established and precluded. [*Id.*] On March 23, 2017, Plaintiffs sought and received an extension of the new dispositive motion deadline. *See* [#94, #97]. Plaintiffs filed the instant Motion for Summary Judgment on May 1, 2017. *See* [#106]. Defendants filed a Response on May 15, 2017, [#110], and Plaintiffs filed a Reply on May 24, 2017. [#111]. On June 6, 2017, Defendants filed what appears to be a surreply. [#112].[3] The Motion for Summary Judgment is

---

[3] This court construes Defendants' papers liberally because they are proceeding *pro se*. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir.1991). Nevertheless, as this court has repeatedly advised, Defendants' *pro se* status does not exempt them from complying with procedural rules or from satisfying substantive law as is required of represented parties. *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1199 n.2 (10th Cir. 2008) (observing that a party's *pro se* status does not relieve him of the obligation to comply with procedural rules) (citation omitted); *Dodson v. Bd. of Cty. Comm'rs*, 878 F. Supp. 2d 1227, 1236 (D. Colo. 2012). Neither the

thus ripe for disposition, and the undersigned finds that oral argument would not materially assist in the resolution of this matter.

## LEGAL STANDARD

A party may be entitled to summary judgment prior to trial if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). "A 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Service*, 812 F.2d 621, 623 (10th Cir. 1987). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Com*, 391 U.S. 253, 289 (1968)).

In reviewing a motion for summary judgment the court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002). Where, as here, the moving parties will bear the burden of proof on an issue at trial, they must affirmatively demonstrate that no reasonable trier of fact could find other

---

Federal Rules of Civil Procedure nor the Local Rules of Practice of this District contemplate that a party may freely file a surreply. However, Plaintiffs did not move to strike the surreply and I do not find that it materially affects the court's analysis of the Motion for Summary Judgment.

than for the moving party. *See Celotex Corp.*, 477 U.S. at 323. Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-movant "may not rest upon mere allegation or denials of [the] pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Conclusory statements based merely on speculation, conjecture, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.,* 366 F.3d 869, 875 (10th Cir. 2004). The nonmoving party's evidence must be more than "mere reargument of [its] case or a denial of an opponent's allegation," or it will be disregarded. *See* 10B Charles Alan Wright, et al., Federal Practice and Procedure § 2738 at 356 (3d ed.1998). However, even where a non-moving party fails to respond to a motion for summary judgment, a court cannot automatically grant summary judgment in favor of the moving party. *See Issa v. Comp USA,* 354 F.3d 1174, 1177 (10th Cir. 1993). Rather, the court may enter summary judgment only if Plaintiffs carry their burden under Rule 56 of the Federal Rules of Civil Procedure and demonstrate that no genuine issue of material fact exists and they are entitled to judgment as a matter of law. *See Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002).

The Tenth Circuit has observed that the rights of *pro se* litigants require "careful protection where highly technical requirements are involved…" *Jaxon v. Circle K Corp*., 773 F.2d 1138, 1140 (10th Cir. 1985) (quoting *Garaux v. Pulley*, 739 F.2d 437, 439 (9th Cir. 1984)). With this guidance, the court reads Defendants' Response to the Motion for Summary Judgment with a liberal construction in mind; however, the court cannot, and will not, act as Defendants' counsel in this matter. The court will not craft arguments on behalf of Defendants, or "peruse the record…in search of evidence" not readily accessible, *Securities and Exch. Comm'n v.*

*Capital Hldgs., L.L.C.*, No. 03-CV-00923-REB-CBS, 2006 WL 1660541, at *1 (D. Colo. June 12, 2006); but this court will consider the totality of admissible evidence, including but not limited to the depositions of the Sacketts and their minor child (the transcripts of which Plaintiffs submitted along with their Motion), in evaluating whether summary judgment is appropriate. Indeed, Rule 56 explicitly provides that the court may consider "other materials" in the record in adjudicating a motion for summary judgment. Fed. R. Civ. P. 56(c)(3). *See Pipkins v. Taillon,* No. 12-CV-02275-REB-KLM, 2014 WL 4197945, at *4 (D. Colo. Aug. 25, 2014).

Additionally, the court will not consider unverified statements not admitted to by the opposing party. *See Lopez-Bignotte v. Ontivero*, 42 F. App'x 404, 408 (10th Cir. 2002) (affirming grant of summary judgment where non-moving party did not file affidavits or submit other admissible evidence to refute the affidavits filed by moving party in support of motion for summary judgment). The Sacketts did not refer to evidence in their Response or surreply, or attach evidence thereto. [#110, #112]. The Response itself is styled as a "declaration," and concludes with each Defendant's signature and the date but is not sworn under the penalty of perjury. *See* [#110]. Similarly, the surreply contains entirely unsworn testimony, some of which appears to take issue with other sworn testimony. [#112]. The Response and surreply do not comply with 28 U.S.C. § 1746, and thus do not constitute evidence that can create factual disputes for the purpose of precluding summary judgment. *See Dodson v. Board of County Com'rs*, 878 F. Supp. 2d 1227, 1244 n.4 (D. Colo. 2012). *See also Hayes v. Marriott*, 70 F .3d 1144, 1148 (10th Cir. 1995) ("Unsworn affidavits do not raise factual issues precluding summary judgment") (citation omitted); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 n.1 (10th Cir. 1994) (noting that unsworn affidavits may be used in summary judgment proceedings, but only if they comply with the requirements of 28 U.S.C. § 1746 and are signed under penalty of

perjury). In addition, as discussed below, to the extent that Defendants are now attempting to provide information that should have previously been disclosed in response to the Interrogatories and were not reflected in their sworn deposition testimony, they will not be permitted to do so.

## MATERIAL FACTS

### Framework

Plaintiffs ask that the court deem as established the facts in Plaintiffs' Statement of Undisputed Material Facts "that correspond to Defendants' failure to respond to Plaintiffs' interrogatories," which Plaintiffs cite as Undisputed Material Facts: 1-3, 11-13, 15, 23-25, 28-29, 31-39, 42, 45-46, 59. [#104 at 4]. Plaintiffs state that these facts fall into five categories: "(1) Defendants' employment and nonpayment of Plaintiffs, (2) Defendants' operation of their businesses, (3) Defendants' business dollar volume and inclusion in the 'Retail and Service' industry, (4) Defendants' limited financial support of Plaintiffs, (5) Defendants' expectation that Plaintiffs work off their 'debt' by working without pay." [*Id.*] The court agreed with Plaintiffs in a previous order that Defendants should be precluded from (1) offering evidence that was not disclosed in discovery; (2) contradicting testimony provided during their depositions; and (3) relying on uncorroborated statements so as to contradict Plaintiffs' asserted factual allegations, where only Defendants (rather than Plaintiffs) have access to such information. *See* [#91 at 16, #104]. As explained in more detail below, given the record before it, the court cannot deem all of these facts as uncontested.

First, in light of Defendants' sworn and consistent testimony at deposition that they did not employ Plaintiffs and that Plaintiffs performed no work for them, this court cannot accept the proposed undisputed facts that relate to the duration and type of work performed by Plaintiffs. For instance, the proffered undisputed fact in ¶ 23 contends:

> Defendants required Esmeraldo Echon to perform a variety of jobs for them from September 2011 through September of 2014. He worked on their rental properties—cleaning, making repairs, doing yard work, and painting. He also worked in Defendants' fields, greenhouse, market, and at their home, including building a garage and concrete wall fence, and flooring a warehouse. He generally worked ten hours per day for six days per week.

[#104 at 6, ¶ 23]. For the same reasons, the court cannot deem as true the statement that "Justin Echon worked in Defendants' fields, on construction projects, and on other miscellaneous or domestic work for about nine hours each day for six days each week." [*Id.* at ¶ 34]. Nor can the court deem as true the statement that "Defendants required Maribel Echon to work for Defendants, by caring for Leonida Sackett and Esmeraldo Echon's mother, Conchita Echon." [*Id.* at ¶ 36]. Indeed, these statements appear to be contradicted by third party evidence in the record. For instance, Isidro Fierro testified during his deposition regarding Plaintiffs that, "[t]hey – they will – I will see them walking, but never saw them working, but they're supposed to work, I don't know." [#104-28 at 15:9-11].[4] Similarly, the Sacketts' minor child testified during her deposition that Plaintiffs never worked in the market or in the fields, and never took care of Mrs. Conchita Echon. *See* [#104-29]. This court finds no basis for depriving Defendants the ability to testify consistently with the position they have always asserted, i.e., they did not employ Plaintiffs or otherwise cause Plaintiffs to perform work for them. However, having unequivocally denied that Plaintiffs ever performed any work of any sort for them, Defendants cannot temper their testimony at trial by suggesting that Plaintiffs may have undertaken "some work," or that they paid Plaintiffs for "any work" Plaintiffs may have performed. *See* [#104 at 19].[5] Similarly, Mrs. Sackett testified unequivocally at her deposition

---

[4] In citing deposition transcripts, this court refers to the page number originally assigned in the transcript of the deposition, not the page number assigned by the court's ECF system.

[5] Given the diametrically opposite testimony regarding these facts, the factfinder will be faced with a black and white determination: either Plaintiffs worked for Defendants for the duration

that she and her husband provided "enough food" to Plaintiffs and that they provided food four times a month. *See* [#104-22 at 151:9-17]. Accordingly, the court cannot deem as admitted the statement that "Defendants failed to provide sufficient food to Plaintiffs, leaving them hungry." [#104 at ¶ 45].

However, the court will deem admitted other facts that Plaintiffs propose are undisputed as a result of Defendants' failure to appropriately respond to certain Interrogatories. For instance, this court will accept as true that Defendants paid no more than $300 per month for utilities for Plaintiffs' housing in Rocky Ford, in light of Defendants' failure to respond to Interrogatory No. 8 regarding financial support provided to Plaintiffs and Jeffrey Echon. *See* [#104 at ¶ 12]. This court will also accept as true that Defendants did not pay Esmeraldo or Maribel Echon for any work and gave them money only a few times and after they had begged. *See* [*id.* at ¶ 25]. Likewise, the court will accept as true the fact that Defendants occasionally paid Justin Echon a small amount for work, and never paid Maribel Echon for work. [*Id.* at ¶¶ 33, 38]. The court will also accept facts establishing that Plaintiffs depended on Defendants for food and lodging. [*Id.* at ¶¶ 42]. And, in light of Defendants' failure to respond to Interrogatory No. 3, the court will accept as true that Mr. Sackett was aware that his wife did not pay Plaintiffs for any work. [*Id.* at ¶ 39].

Finally, some of the facts Plaintiffs propose as undisputed as a result of Defendants' failure to respond are too attenuated to the associated Interrogatories, because the fact offered as undisputed is not actually responsive to the particular Interrogatory. For example, Plaintiffs ask to establish as true that when they "asked Defendants for help finding a paying job, Defendants refused." For support they cite Maribel Echon's declaration and Defendants' failure to respond

---

and amount described by Plaintiffs; or Plaintiffs did not work for Defendants at all. Defendants should not be permitted to attempt to explain away evidence of labor undertaken by Plaintiffs.

to Interrogatory No. 8. However, Interrogatory No. 8 asks Defendants to "list all times you financially supported any of the Plaintiffs or Jeffrey Echon," and cannot fairly be read to inquire into how or if Defendants responded to Plaintiffs' request for help finding a paying job. Similarly, Defendants' failure to respond to Interrogatory Nos. 6, 7, 15, and 16 does not correlate to establishing as true the statement that "Leonida Sackett told Plaintiffs that they needed to work off their debt for the costs Defendants had incurred for bringing Plaintiffs to the United States [sic] She never specified the amount they owed or a timeframe for paying it off." [#104 at ¶ 13]. This court is even more reluctant to deem such a fact admitted in light of Mrs. Sackett's unequivocal denial that she ever threatened Plaintiffs. *See* [#104-22 at 162:13-14]. The facts as discerned by this court, both undisputed and disputed, are set forth in detail below.

<u>Undisputed Material Facts</u>

In applying the framework as set forth above, the court concludes that the following facts are undisputed. Defendants own and operate a farm and retail produce market known as "Sackett's Farm Market," and own several residential rental properties in Rocky Ford, Colorado. [#1 at ¶¶ 10, 12, #11 at ¶¶ 10, 12]. Defendants earned more than 50 percent of their annual dollar volume of business from sales to the public transacted through their market. [#1 at ¶ 11, #11 at ¶ 11, #104-21 at 22:10-14, 75:2-20, 126:13-17]. Defendants are in charge of the day to day operation of their businesses, including supervision of the work. [#104-21 at 99:18-19, 175:21-176:2, #104-22 at 54:13-15, 56:9-14, 62:6-8, 177:9-11].

Defendant Leonida Sackett is a U.S. Citizen. [#1 at ¶ 20, #11 at ¶ 20]. Esmeraldo Echon is Mrs. Sackett's brother, and Plaintiff Maribel Echon is married to Esmeraldo Echon. Mrs. Sackett petitioned the U.S. Citizen and Immigration Services (USCIS) to obtain legal permanent residency status for Plaintiffs. [#1 at ¶ 23, #11 at ¶ 23]. Defendants signed USCIS Form I-864

Affidavit of Support as the sponsors of Plaintiffs. [#104-6]. Plaintiffs were approved as U.S. Legal Permanent Residents and traveled to the United States to live. [#104-18 at ¶¶ 5, 7, 16, #104-19 at ¶ 7]. Esmeraldo Echon moved to Rocky Ford, Colorado from the Philippines in September 2011. [#104-18 at ¶ 5, #104-19 at ¶ 6]. In April 2012, Maribel Echon moved to Rocky Ford with three of their sons, Plaintiff Justin Echon, Jeffrey (who is not a party to this action), and a minor son. [#104-18 at ¶ 6, #104-19 at ¶¶ 5, 7]. Plaintiffs lived in one of the rental houses owned by the Sacketts until mid-September 2014. [#104-18 at ¶¶ 19, 122, #104-19 at ¶¶ 13, 62]. At all times relevant to this, case the rental value of the housing Defendants provided to Plaintiffs was no more than $750 per month. [#51 at ¶ 24].[6] The Sacketts supplied Plaintiffs with food valued at $12,500, or less. [*Id.* at ¶ 25]. The Sacketts provided for transportation for Justin Echon and Plaintiffs' minor son to and from school, valued at approximately $1,600. [*Id.* at ¶ 30]. To the extent a jury finds that Esmeraldo and Maribel Echon performed work for the Sacketts, the Sacketts did not pay for their work and only gave them money a few times after the Echons had begged, [#104-18 at ¶¶ 21, 59, 67, 78, #104-19 at ¶¶ 16-17, #104-24 at ¶ 20], and William Sackett was aware that his wife did not pay Plaintiffs for their work. [#104-18 at ¶ 113, #104-20 at ¶ 23]. Similarly, to the extent a jury finds that Justin Echon performed work for the Sacketts, William Sackett paid Justin Echon only occasionally, and only a small sum for his work. [#104-20 at ¶¶ 20-21, 26, 35-36, #104-18 at ¶¶ 21, 23, 67, #104-15].

---

[6] On September 22, 2015, Defendants filed an Objection to this court's Recommendation that a motion to vacate be converted into a motion for judgment on the pleadings, and denied. *See* [#51]. This court declines to accept the Objection and assertions therein into evidence as interrogatory responses on which the Sacketts can rely to carry their Rule 56(c)(1)(B) burden, because the Objection is not sworn to under oath. *See* Fed. R. Civ. P. 33(b)(3). However, this court accepts Plaintiffs' references to the Objection in support of their Statement of Undisputed Facts, *see, e.g.,* [#104 at ¶¶ 43, 49], and for the purpose of satisfying their Rule 56(c)(1)(A) burden. *See* [*id.* at 29]. *See also* F.R.E. 801(d)(2)(A) (an opposing party's statement is not hearsay if it is offered against an opposing party and "was made by the party in an individual or representative capacity.").

Plaintiffs spoke very little English when they arrived in the United States and still are not fluent in English. [#104-18 at ¶ 15, #104-19 at ¶ 10]. Defendants kept Maribel and Justin Echon's residency and Social Security cards from Plaintiffs for over a year. [#104-18 at ¶¶ 41, 42]. In January 2013, Esmeraldo Echon suffered from complications with his kidneys. [#104-18 at ¶¶ 79-80]. Plaintiffs depended on Defendants for food and lodging. [#104-18 at ¶ 30, #104-20 at ¶ 9]. Justin Echon and his minor brother attended school in Rocky Ford. The Sacketts rarely bought clothing or shoes for Plaintiffs, or school supplies for Esmeraldo and Maribel's school-age children. [#104-19 at ¶ 51, #104-25 at ¶ 11].

In the fall of 2013, Plaintiffs applied for food stamps with Otero County, Colorado. They ultimately received food stamps for their minor son, and by summer of 2014 were receiving $189 per month. [#104-18 at ¶ 120, #104-19 at ¶ 60, #104-20 at ¶ 36, #104-24 at ¶ 24, #104-3 at 8-9]. Plaintiffs received food and clothes from service providers, a Presbyterian Church, the food bank, and the Salvation Army. [#104-18 at ¶¶ 83-84, #104-19 at ¶ 53, #104-25 at ¶¶ 5, 9, 11, #104-23 at ¶ 4, #104-24 at ¶ 23].

In June 2014, Plaintiffs sought assistance from Colorado Legal Services to help them leave the Sacketts. [#104-18 at ¶¶ 98, 108, #104-19 at ¶ 54]. Around this time, Esmeraldo and Maribel Echon started working at odd jobs for Rocky Ford resident Phyllis Adkins, who would provide transportation for them to and from her home. [#104-18 at ¶ 121, #104-19 at ¶ 61, #104-25 at ¶ 13, #104-23 at ¶ 7]. Plaintiffs left Rocky Ford in September of 2014. [#104-19 at ¶ 54, #104-25 at ¶ 16]. Since their departure, they have not received any money or support from the Sacketts. [#104-18 at ¶ 122, #104-19 at ¶ 62, #104-20 at ¶ 37]. In October 2014, Plaintiffs earned about $250 working at a cell-phone company. [#104-18 at ¶ 123, #104-19 at ¶ 62, #104-20 at ¶

38].[7]   After the job with the cell phone company, Plaintiffs were not able to find stable employment until January 2015.   [#104-18 at ¶ 124, #104-19 at ¶ 63].   Since January 2015, Esmeraldo and Maribel Echon have been employed full time.   [#104-18 at ¶ 124, #104-19 at ¶ 64].

Disputed Material Facts

The Sacketts did not provide a statement of undisputed material facts, or challenge the statement of undisputed material facts presented by Plaintiffs.   Nonetheless, the record contains evidence, provided by Plaintiffs, that gives rise to genuine and material disputes of fact.   That evidence is as follows.[8]   William Sackett testified at his deposition that he manages the farm and supervises those who work on his farm.   [#104-21 at 99:18-19, 111:21-22].   He testified that none of Leonida Sackett's family members worked on the Sacketts' farm:

> Q: Do any of Leonida's family members work on the farm?
> A: No.
> Q: Have they ever?
> A: No.
> Q: No one's ever worked on the farm?
> A: No.
> Q: Not one day?
> A: Not one day.
> Q: So none of the plaintiffs in this case—
> A: They never worked. They never was employed. They was never asked to be employed. They was never, ever any time card filled out, any I-9 form filled out. No Social Security cards taken, no numbers, nothing. They absolutely did no farm work or any employment of any kind on the farm…or on any other thing that the Sackett family owns.

---

[7] It is unclear which Plaintiff held this job, as the declarations of all three Plaintiffs include the same statement.

[8] In finding that these facts are contested, this court notes that in certain instances statements in Plaintiffs' declarations find support in other documents in the record.   This court stresses, however, that it in no way passes on the veracity of the testimony of any of the Parties or witnesses.   Rather, this court is mindful that its role at this juncture is not to weigh evidence or judge credibility.   *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000); *Fogarty v. Gallegos,* 523 F.3d 1147, 1165–66 (10th Cir. 2008).

[#104-21 at 102:2-22]. In response to follow-up questions, Mr. Sackett testified that Plaintiffs undertook no "custom work," and while they "may have did something on the – not on the farm, something on the property I own," they were "never employed or never asked to do anything, not of an employment nature." [*Id.* at 103:2-9]. He also testified that Plaintiffs were "never, ever asked to do any work or ever employed to do any work," and that they "never did no work they was not paid for [and] [t]hey never did any work that they was paid for because they never did no work that was employed." [*Id.* at 105:12-25]. Plaintiffs' counsel asked Mr. Sackett, "did [Plaintiffs] perform any activity related to work, whether it was paid or unpaid, whether it was related to employment or not?," to which Mr. Sackett responded, "I'm going to tell you, no." [*Id.* at 107:13-17]. Plaintiffs' counsel also asked Mr. Sackett about whether he ever saw Plaintiffs performing work of any kind on the Sacketts' property:

> Q: You never saw them volunteer?
> A: No, sir.
> Q: You never saw them work on your farm?
> A: No, sir.
> Q: You never saw them work in the market?
> A: No, sir. They never worked in the market.

[*Id.* at 110:3-9]. Mr. Sackett testified that his minor daughter, by contrast, works on the farm: "Q: What type of work does she do…A: Oh, heck, just whatever there is to do; feed the horse…I mean, what can't she do. She can…the gal can do anything that I ask her to do. I ask her to drive a tractor, plant and plow and disk and -- she can do it." [#104-21 at 99:29-100:5]. Mr. Sackett testified that his daughter has been working on the farm since she was approximately eight years old and that she is not paid. [*Id.* at 100:18-24 ("Well, she's 18. So she's been working with me for probably 10 years. And she don't get paid.")]. In response to questions regarding how many hours a day Mr. Sackett's daughter works, he testified:

> A: I don't know. There's all different hours, you know. She's family, you know,

you don't – how many hours does a family work? What difference does it make?
You know – you know, you're asking questions again that don't amount to
nothing.
Q: Well, I still want to know an answer. It can be your best guess. How many
hours does she work?
A: One hour a day.
…
Q: During the busiest season, she works one hour a day?
A: Oh, maybe she might work – she might work 8 or 10 then. She don't get paid
even then.

[*Id.* at 100:25-101:17].

During her deposition, Leonida Sackett testified that Esmeraldo Echon did not work around the Sacketts' property. He did not clean the yard, help with maintenance, care for Conchita Echon (Mrs. Sackett and Esmeraldo Echon's mother), work at the Sacketts' market, or work on the Sacketts' farm. [#104-22 at 157:12-158-25, 159:10-23]. Leonida Sackett testified that Maribel Echon did nothing to contribute around the Sacketts' property, and that she generally stayed home and took care of her children. [*Id.* at 159:24-160:4]. Mrs. Sackett testified that Maribel Echon did not care for Conchita Echon, "[n]ot one thing." [*Id.* at 161:16-22, 180:15-17]. Mrs. Sackett also testified that she was not abusive to Esmeraldo or Maribel Echon, and rather, Maribel was verbally abusive to her. *See, e.g.,* [*id.* at 168:9-23, 218:11-21]. She also testified that Plaintiffs were dependent on her for food and health care, but that they had access at all times to a vehicle and Esmeraldo could drive. [*Id.* at 220:17-221:17, 223:3]. Mrs. Sackett testified that Plaintiffs did not feel that they owed her a debt, did not feel obligated to help around the property, and did not worry that she would withhold food or care. [*Id.* at 223:4-21]. She further testified she never threatened to have Esmeraldo or Maribel deported. [*Id.* at 214:17-215:4]. Rather, she encouraged them to learn English, attend school, and find employment. [*Id.* at 219:17-220:1, 224:4, 224:24-225:5-8].

Mrs. Sackett also testified that she remembered when Plaintiffs moved from Rocky Ford

to Manzanola, Colorado, and testified, in response to questioning about what she thought about Plaintiffs working in Manzanola, that she "love[d] it…when they went to work." [#104-22 at 227:5-11]. She testified that Esmeraldo and Maribel wanted her to care for the children while they lived and worked in Manzanola, [*id.* at 227:12-228:25], and that she warned Esmeraldo and Maribel Echon when they left Rocky Ford that "they might get in trouble for leaving [their] kids at home." [*Id.* at 232:6-233:18]. Mrs. Sackett testified that Esmeraldo and Maribel chose to return to Rocky Ford because they could not afford to pay for their apartment in Manzanola. [*Id.* at 230:1-5]. She testified that she gave Esmeraldo Echon $3,500 during the first year he lived in Rocky Ford to satisfy a mortgage on land in the Philippines; she otherwise did not give him or the other Plaintiffs money during their stay. [*Id.* at 266:10-17].

In light of the Sacketts' testimony, the court finds that the following testimony given by Plaintiffs, and identified in the Motion for Summary Judgment as undisputed, is in fact disputed. Esmeraldo Echon attests that Defendants required him to perform a variety of jobs for them from September 2011 through September of 2014. He worked on their rental properties—cleaning, making repairs, doing yard work, and painting. He also worked in Defendants' fields, greenhouse, market, and at their home, including building a garage and concrete wall fence, and flooring a warehouse. He generally worked ten hours per day, six days per week. [#104-18 at ¶¶ 51-53, 56-58, 64-65, 68-69, 71-74, 82, 90, 92, 93, 95, 97, 109, #104-24 at ¶¶ 6-16]. He attests that Leonida Sackett primarily directed him in the work he performed, but that William Sackett ordered work done as well on several occasions, and William Sackett was aware of all the work Esmeraldo Echon performed for them. [#104-18 at ¶ 111]. Except for a one week period in 2012, Leonida Sackett did not allow Esmeraldo Echon to work anywhere else. [#104-18 at ¶¶ 29, 36]. In the fall and winter of 2012, the Sacketts "lent" Esmeraldo and Jeffrey Echon to their friends in

Rocky Ford for two or three months to construct a warehouse. Esmeraldo and Jeffrey Echon worked eight hours each day for six days each week during this time. [#104-18 at ¶¶ 72-76]. Esmeraldo Echon is "sure" that the friends paid the Sacketts for the labor, but he and his son did not receive payment. [*Id.* at ¶¶ 77-78]. Leonida Sackett told Plaintiffs not to talk about their living and working conditions. She told Esmeraldo Echon to lie and say he and his family were just helping out, and she attempted to prevent him from talking to anyone. [#104-18 at ¶¶ 48-50].

Justin Echon attests that he attended high school between August 2012 and May 2013 and August 2013 and May 2014, but worked at least one day a week for the Sacketts, and also every day during summers and school holidays. [#104-20 at ¶¶ 11-14, 16-19, 24, 27-28]. He attests that William Sackett assigned work to him. [#104-20 at ¶ 22]. Justin Echon attests that he worked in Defendants' fields, on construction projects, and on other miscellaneous or domestic work jobs for about nine hours each day for six days each week. [#104-20 at ¶¶ 11, 13, 17, 25]. And he attests that during the 2012-2013 and 2013-2014 school years, he worked one day every week, usually Saturdays, for nine hours and usually in the fields. [*Id.* at ¶¶ 16- 18, 24, 27, 29].

Maribel Echon attests that the Sacketts required her to work on their farm, and at their market, rental properties, and home for about six hours per day, three days per week. [#104-19 at ¶¶ 33-34, #104-24 at ¶¶ 17-19]. Between April 2012 and September 2014, the Sacketts required Maribel Echon to work for them by caring for Conchita Echon. [#104-19 at ¶¶ 19, 21, #104-24 at ¶¶ 17-19, #104-4 at 3-8]. She attests that Defendants never paid her for any of her work, [#104-18 at ¶¶ 21, 23, 67, #104-19 at ¶¶ 17, 27, 38, 52].

Plaintiffs attest that Leonida Sackett told them they needed to work off their debt for the costs Defendants had incurred for bringing Plaintiffs to the United States. Leonida Sackett never specified the amount Plaintiffs owed or a timeframe for paying off the debt. [#104-18 at ¶¶ 25-

27, 31-33, 40, #104-19 at ¶ 35]. Plaintiffs did not want to work without pay and told Leonida Sackett they wanted to find paying jobs. [#104-18 at ¶¶ 28, 34, 35, #104-19 at ¶ 35]. When Plaintiffs asked Defendants for help finding a paying job, Defendants refused. [#104-18 at ¶¶ 34-36]. Defendants coerced Plaintiffs into working for them for no pay by threatening to deport Plaintiffs and through verbal abuse. [#104-18 at ¶¶ 20-22, 37-39, 44, #104-19 at ¶¶ 14, 15, 18, #104-20 at ¶ 10, #104-24 at ¶ 27]. Leonida Sackett threatened to deport Plaintiffs on multiple occasions, [#104-18 at ¶ 44, #104-19 at ¶ 37, #104-20 at ¶ 10], and Plaintiffs believed Leonida Sackett could have their family deported because she sponsored their applications for legal permanent residency. [#104-18 at ¶ 45, #104-19 at ¶¶ 35-37, #104-20 at ¶ 10, #104-23 at ¶ 11]. Finally, Plaintiffs attest that the Sacketts failed to provide them with sufficient food. [#104-18 at ¶¶ 60-63, #104-25 at ¶ 9, #104-23 at ¶¶ 4, 7, #104-24 at ¶¶ 22-23].

Plaintiffs attest that in April 2013, a workforce organization in Rocky Ford tried to help them leave their situation with the Sacketts and move to Manzanola, Colorado. Leonida Sackett would not allow Esmeraldo and Maribel Echon's younger sons to leave, and Plaintiffs "had no means to bring them to Manzanola to live with [them]," or to find work. Plaintiffs returned to Rocky Ford after approximately one month. [#104-18 at ¶¶ 86-89, #104-19 at ¶¶ 41-42]. Plaintiffs lived in fear of Defendants, and felt they had no choice but to work for Defendants. [#104-18 at ¶¶ 31, 47, #104-19 at ¶ 36, #104-20 at ¶¶ 9-10]. Plaintiffs felt trapped and hoped someone would help them escape from their situation with Defendants. [#104-18 at ¶ 85]. Plaintiffs suffered emotionally and suffered from loss of sleep and depression as a result of Defendants' verbal abuse and threats. [#104-18 at ¶ 114, #104-19 at ¶ 55, #104-20 at ¶¶ 31-32].

**ANALYSIS**

Plaintiffs allege that over the course of three years, the Sacketts systematically coerced and threatened them into working without pay. The Sacketts dispute the allegation generally, and contend that they paid for Plaintiffs to leave the Philippines, and provided for Plaintiffs in Rocky Ford, strictly as acts of beneficence.

**I.    Statutory Claims**[9]

**A. Claim One: Liability Under Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589, asserted by Esmeraldo Echon and Justin Echon**

1. *Applicable Law*

The forced labor provision of the Trafficking Victims Protection Act of 2000 ("TVPA"), as amended by the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), governs forced labor, and identifies as a criminal defendant one who:

> [K]nowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means--
>
> (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person;
> (2) by means of serious harm or threats of serious harm to that person or another person;
> (3) by means of the abuse or threatened abuse of law or legal process; or
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.

18 U.S.C. § 1589(a). In addition, liability lies for anyone who "knowingly benefits, financially or by receiving anything of value, from participation in a venture which has engaged in the providing or obtaining of labor or services by any of the means described in subsection (a),

---

[9] Plaintiffs represent in the Motion for Summary Judgment that they "intend to dismiss Claim 2," which asserts a violation of the FLSA. [#104 at 1 n.1]. *See also* [#1].

knowing or in reckless disregard of the fact that the venture has engaged in the providing or obtaining of labor or services by any of such means." *Id.* at § 1589(b). The TVPRA contains a civil remedy provision that establishes a private cause of action against one who violates the statute:

> An individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter) in an appropriate district court of the United States and may recover damages and reasonable attorneys fees.

*Id.* at 1595(a). *See also Mojsilovic v. Oklahoma ex rel. Board of Regents for University of Oklahoma*, 841 F.3d 1129, 1130 (10th Cir. 2016) (noting the TVPRA "provides a civil remedy for victims of forced labor"). Section 1589 defines "abused or threatened abuse of law or legal process," as:

> the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action.

18 U.S.C. § 1589(c)(1). The term "serious harm" is defined as:

> any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm.

*Id.* at § 1589(c)(2).

Esmeraldo and Justin Echon argue that the Sacketts are liable under this claim for serious harm or threats of serious harm, abuse or threatened abuse of law or legal process, or for a scheme, plan, or pattern that was intended to cause Plaintiffs to believe they would suffer serious harm if they did not perform the labor. *See* [#104 at 13-14]. *See also* 18 U.S.C. § 1589(a)(2)-(4).

2. *Evidence*

**Esmeraldo Echon.** Esmeraldo Echon attests as follows. "As soon as I arrived in Colorado, Nida informed me that I owed her a large amount of money. She said this was for the support she had given me in the Philippines and for the cost of obtaining my legal immigration status." "Nida told me that I was only in the United States because she sponsored me and that I needed to repay her for that debt. Before this, she never said that I had to pay her for sponsoring me, or for buying me a plane ticket to the US." "Nida told me that I had to work this debt off by providing her and Bill with free labor." [#104-18 at ¶¶ 25-27]. When Esmeraldo Echon's wife and three sons "arrived in the U.S. in 2012, Nida informed them that they owed her a large debt and they needed to work it off by providing free labor to her and Bill." [*Id.* at ¶ 40]. "Shortly after Maribel and our sons arrived in the US, their residency documents and Social Security cards arrived at the Sacketts' home," and the Sacketts "kept these important documents for over a year without giving them to, me, Maribel or my sons." [*Id.* at ¶¶ 41-42]. Esmeraldo Echon and his family's native language is Ilocano and their second language is Tagalog. He is learning English, but is not fluent. [*Id.* at ¶ 15].

Esmeraldo Echon also attests:

[f]or about three years, from 2011-2014, the Sacketts forced me to work in their fields, at their farm market, to clean and fix their rental properties, and perform various other jobs. During the nearly three years that we worked for Nida and Bill, we (my wife Maribel, and my sons Jeffrey and Justin) were almost never paid for the work we performed. Sometimes Justin received a small amount at the end of the week, but, it was far less than minimum wage. During this time, Nida and Bill forced us to work under sometimes-harsh conditions, often without enough food.

[*Id.* at ¶¶ 20-21].

I felt that I had no choice but to work for Nida and Bill, just as they insisted. Nida never told me the exact amount of money that I owed her. Nida also never gave me any timeframe in which my debt would be paid off. Nida just told me that I owed her a large amount of money and that I would have to work a long time for

free to pay it off.

[*Id.* at ¶¶ 31-33].

Additionally, "Nida and Bill told us we had to work for them; they said if we did not, they would have us deported from the United States or kicked out of their house. Nida also verbally abused us and threatened us. She would get mad and threaten us. She would swear at me, and argue with us." [*Id.* at ¶ 23]. "Nida would regularly threaten me with deportation if I did not do what she told me to do"; "Nida exploited my feelings of obligation toward her for bringing me and my family here"; "Nida would repeat those feelings of obligation to coerce me to continue working for her and Bill without pay"; and "Nida regularly threatened to deport us if we did not do the work she wanted us to do or if we were not working to her liking." [*Id.* at ¶¶ 37-39, 44]. "I did not know any differently; I thought that Nida could have me and my family deported since she was the sponsor for our legal permanent residency in the US." [*Id.* at ¶ 45]. "[T]here were times that I would come home from working, and I would see Maribel and my sons crying because Nida had been to the house, and had been mean to them. She verbally abused them. She said terrible things to them." [*Id.* at ¶ 106]. "Since the Sacketts began verbally abusing and threatening me, I have suffered emotionally, including losing sleep and being depression [sic]." [*Id.* at ¶ 114]. "I did not want to work for them without pay. I wanted to find a job where I could earn a wage so that I could help build a life for myself and my family in the United States." [*Id.* at ¶ 28]. "On many occasions, I told Nida that I wanted to find a paying job. When I would say this, Nida would tell me that I still owed her a lot of money and I needed to keep working it off." [*Id.* at ¶¶ 34-35]. "I felt that I had no choice but to work for Nida and Bill, just as they insisted." [*Id.* at ¶ 31]. "I was forced to depend on Nida and Bill for food, lodging, transportation, and communication with others." [*Id.* at ¶ 30]. Finally:

> Many times, Nida stressed to me, my wife, and our older sons that we should not talk to anyone about our work or our living conditions. In fact, many times when I was working at the market, Nida told me to tell anyone who asked that I was not working; I was just to tell them that I was just helping out my sister. Several times, Nida tried to prevent me from talking to anyone except her and Bill.

[*Id.* at ¶¶ 48-50].

In April 2013, a workforce organization in Rocky Ford tried to help Plaintiffs to leave their situation with the Sacketts and move to Manzanola, Colorado. Leonida Sackett would not allow Esmeraldo and Maribel Echon's younger sons to leave, and Plaintiffs "had no means to bring them to Manzanola to live with [them]," or to find work. Plaintiffs returned to Rocky Ford after approximately one month. [#104-18 at ¶¶ 86-89] *see also* [#104-19 at ¶¶ 41-42].

***Maribel Echon.*** Maribel Echon attests as follows. "For a little more than two years, from about April 2012 to June 2014, Nida and Bill forced me and my two older sons to work in their fields, at their farm market, to clean and maintain their rental properties, and perform various other jobs. My husband had to do this work also, and he was in the US for about a year before the rest of us arrived." [#104-19 at ¶¶ 14-15]. "Nida and Bill told my family and me that we had to work for them. They said if we didn't, they would have us deported from the United States, or they would kick us out of their house. Leonida also verbally abused and threatened us. She called us mean names, ordered us around, and swore at us on many occasions." [*Id.* at ¶ 18]. "Nida would often threaten me that she was going to call the police or the immigration authorities if I did something not to her liking." [*Id.* at ¶ 37]. "Since Nida began verbally abusing and threatening me, I have suffered emotionally, including but not limited to loss of sleep and feelings of depression and hopelessness." [*Id.* at ¶ 55]. "I did not want to perform any of these tasks without pay; however, Nida would force me to do this work by verbally insulting me and telling me that I was obligated to do so because of all the assistance she had provided to me, my husband,

and my sons in the Philippines and in Colorado." [*Id.* at ¶ 35]. And, "[w]henever we asked for help in finding a paying job, such as help with transportation, Nida or Bill refused to provide any help and continued to force us to work for them without pay." [*Id.* at ¶ 40]. "I felt that I had no other option than to follow Nida's orders." [*Id.* at ¶ 36]. Maribel Echon is learning English but is not fluent. [*Id.* at ¶ 10].

**Justin Echon.** Justin Echon attests as follows. He believed that he, his parents, and his brothers "would suffer serious harm if I did not do the work my aunt and uncle told me to do. My Aunt and Uncle told us they would deport us if we did not do the work they told us to do; I did not know better, and believed that they could deport us, so I felt I had no choice but to work for my aunt and uncle." [#104-20 at ¶ 10]. "It was upsetting to see my mother and father be treated the way they were by my Aunt Nida and Uncle Bill. I did not like how my aunt and uncle cursed at my parents. I also did not like how they never gave us much food, or let my Mother and Father work anywhere else." [*Id.* at ¶ 31]. "I could see that my parents were completely dependent on my aunt and uncle for support and I believed that I had no other choice but to do the work my Aunt Nida made me do." [*Id.* at ¶ 9]. "Since Nida began verbally abusing and threatening me, I suffered emotionally including loss of sleep and feelings of depression and hopelessness." [*Id.* at ¶ 32].

**Nonparties.** A friend of Plaintiffs, Albert Hall, provided a declaration in support of Plaintiffs' Motion for Summary Judgment. [#104-24]. Some of Mr. Hall's statements are admissible, and will be considered by the court. For instance, Mr. Hall attests:

> Junior and Maribel did work for Defendants Bill and Leonida Sackett on a regular basis, for many days and many hours during the period I knew them.. … I witnessed them working a various locations on the Sacketts' property on many occasions when I picked them up from work, brought them food, or just stopped by to see them.

[*Id.* at ¶ 6].  Mr. Hall further attests that "I saw Junior working for Defendants on many occasions. I saw him at the Sacketts' produce stand several times, during the late spring and summer months, when the produce stand was open."  [*Id.* at ¶ 7].  The court considers these statements to be admissible evidence.  However, other statements offered by Mr. Hall are not admissible, such as:

> Junior and Maribel told me that if he took a day off from working the fields, Leonida would say that he needed to work more. She would say that Junior's family was costing the Sacketts money and that she was letting them have a house. She also threatened to send them back to the Philippines since she was their sponsor.

[#104-24 at ¶ 27].  *See* F.R.E. 801(c).  These statements are inadmissible hearsay that cannot be considered at summary judgment.  *See Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) ("[S]ummary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form.")

Another friend of Plaintiffs and resident of Otero County, Colorado, Phyllis Adkins, attests that, from her experience and observations, "the Echons are a very nice family and hard workers. There was a time when many church members were involved at just helping them survive.  They were in a very difficult situation.  They were scared to death that Leonida was going to send them back to the Philippines."  [#104-23 at ¶ 11].  She also attests:

> Leonida would not allow them to run the air conditioner that was installed in the house, and sometimes threatened to turn off the gas if they didn't work for her. On one occasion, Maribel Echon asked me if it was normal to have an electric bill for $2,000, because that is what Leonida had told them it cost.

[*Id.* at ¶ 10].  These statements are admissible.

Finally, Frances Miller, a resident of Otero County and secretary of the Community Presbyterian Church in Rocky Ford, attests that she met Emeraldo and Maribel Echon in 2014 when they approached the food bank at her church.  [#104-25 at ¶ 5].  Ms. Miller attests that

"Maribel also told me that they were only given one roll of toilet paper for the entire family to use, and very little soap." [*Id.* at ¶ 10]. This statement is inadmissible hearsay and is not considered by the court. Additionally, the court will not admit Ms. Miller's statements that "Junior and Maribel came to the food pantry at the Church because they said they needed some food. Maribel said that Nida was not giving them enough food," [*id.* at ¶ 7]; "Maribel told me that Nida only gave them a bag of rice and one chicken each month and it just was not enough to feed all of them who were living together, [*id.* at ¶ 8]; and "Junior told me that he had built a fence at Nida's house, and that he was not paid for the work he did, [*id.* at ¶ 14]. These attestations constitute out of court statements offered for the truth of the matter asserted, and Plaintiffs do not suggest that an exception applies. However, the court will admit Ms. Miller's statement that she and "other Church members…got together a big supply of paper products like toilet paper, paper towels, soap and laundry detergent and gave it all to the Echon family." [*Id.* at ¶ 10].

3. *Application*

There is limited case law from the Tenth Circuit discussing the types of acts and conduct that qualify as means of serious harm or abuse of law or legal process for purposes of TVPRA liability. Therefore, the court considers cases from other jurisdictions that have encountered the question.

> Typically…forced labor situations involve circumstances such as squalid or otherwise intolerable living conditions, extreme isolation (from family and the outside world), threats of inflicting harm upon the victim or others (including threats of legal process such as arrest or deportation), and exploitation of the victim's lack of education and familiarity with the English language, all of which are used to prevent [vulnerable] victims from leaving and to keep them bound to their captors.

*Muchira v. Al-Rawaf*, 850 F.3d 605, 618-19 (4th Cir. 2017) (quoting *United States v. Callahan*,

801 F.3d 606, 619 (6th Cir. 2015) and collecting cases) (internal quotation marks and citation omitted)).  Courts have found that "serious harm" includes "threats of any consequences, whether physical or non-physical, that are sufficient under all of the surrounding circumstances to compel or coerce a reasonable person in the same situation to provide or to continue providing labor or services." *Shukla v. Sharma*, No. 07-CV-2972, 2012 WL 481796, at *2 (E.D.N.Y. Feb. 14, 2012) (quoting *United States v. Bradley,* 390 F.3d 145, 151 (1st Cir. 2004), vacated on sentencing grounds, 545 U.S. 1101, 125 S.Ct. 2543, 162 L.Ed.2d 271 (2005)).  The *Shukla* court relied on law from the Second, Eighth, and Ninth Circuits to determine that a worker's "employment and living conditions" may provide support for finding that a defendant's threats "plausibly...compelled the victim[ ] to serve."  *Id.* (quoting *United States v. Farrell,* 563 F.3d 364, 373 (8th Cir. 2009) and citing *United States v. Veerapol,* 312 F.3d 1128, 1130–21 (9th Cir. 2002) (considering working conditions, including "excessive working hours," in analyzing involuntary servitude claim); *United States v. Sabhnani,* 539 F. Supp. 2d 617, 620 (2d Cir. 2010) (affirming forced labor convictions where victims, who did not speak English and did not know how to drive or use a telephone, were, among other things, brought into the United States illegally, physically abused, forced to sleep on the floor, dressed in rags, provided inadequate food, and threatened with arrest).  *See also United States v. Calimlim,* 538 F.3d 706, 713 (7th Cir. 2008) (affirming forced labor conviction of defendants who kept Filipino woman for nineteen years, requiring her to work sixteen-hour days, seven days a week, rarely permitting her to walk outside, and allowing her to speak with her family on only a few occasions).

Additionally, multiple jurisdictions have found that the threat of deportation may itself constitute a threat sufficient to satisfy the second and/or third element of forced labor.  *Aguirre v. Best Care Agency*, 961 F. Supp. 2d 427, 444 (E.D.N.Y. 2013) (stating that "[t]he threat of

deportation alone may support a claim for forced labor" under § 1589); *Nuñag-Tanedo v. E. Baton Rouge*, 790 F. Supp. 2d 1134, 1146 (C.D. Cal. 2011) (holding that the threat of deportation constitutes "abuse of legal process" within the meaning of section 1589 since the objective is to intimidate or coerce the victim into forced labor); *Mojsilovic v. Oklahoma ex rel. Board of Regents for the University of Oklahoma*, No. CIV–14–886–R, 2015 WL 1542236, at *3 (W.D. Okla. Apr. 7, 2015) (collecting cases). *See also United States v. Kozminski,* 487 U.S. 931, 948 (1988) ("[T]hreatening...an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude.").

The second element regarding serious harm may also be satisfied by evidence that the worker/victim was subjected to repeated abuse or threats of violence. *See Guobadia v. Irowa*, 103 F. Supp. 3d 325, 336 (E.D.N.Y. 2015) (finding genuine issues of material fact precluded summary judgment in favor of defendants on plaintiff's forced labor claims, citing plaintiff's testimony that "she was subjected to repeated physical, verbal, and emotional abuse," by defendants, that an individual defendant's "physical blows resulted in visible bruises to the Plaintiff's face," and the same defendant "dragged the Plaintiff on a staircase.").

"When considering whether an employer's conduct was sufficiently serious to coerce the victim to provide labor or services against her will, we must also 'consider the particular vulnerabilities of a person in the victim's position.'" *Muchira*, 850 F.3d at 618 (quoting *United States v. Rivera*, 799 F.3d 180, 186 (2d Cir. 2015)). *See also Guobadia*, 103 F. Supp. 3d at 336 (noting that under the totality of the circumstances, "the fact that the Plaintiff may have been able to come and go as she pleased from the home does not mean the Defendants were not engaging her in unlawful forced labor") (quoting *Elat v. Ngoubene,* 993 F. Supp. 2d 497 (D. Md.

2014) (observing that "[a]lthough the record is replete with evidence that Plaintiff left the Ngoubene home on various occasions and returned, this evidence must be considered under the totality of the circumstances," and finding "there is a sufficient dispute of material fact to permit a jury to determine whether Plaintiff understood that she had any other option"). Courts look to whether a defendant's "misconduct has created a situation where ceasing labor would cause a plaintiff serious harm," recognizing that what constitutes serious harm for that plaintiff must be determined by considering the totality of the circumstances presented. *Nuñag-Tanedo*, 790 F. Supp. 2d at 1145. Serious harm encompasses "not only physical violence, but also more subtle psychological methods of coercion." *Bradley*, 390 F.3d at 150. However, "not all bad employer-employee relationships will constitute forced labor." *Aguilera v. Aegis Communications Group, LLC*, 72 F. Supp. 3d 975, 978 (W.D. Mo. 2014). *See also Muchira*, 850 F.3d at 619-20 (affirming award of summary judgment to defendants, observing that plaintiff admitted that she came to the United States willingly, defendants never physically abused her or threatened her or her loved ones with physical harm, defendants never physically restrained or impeded her from leaving her employment situation, and defendants never threatened her with arrest, deportation, adverse immigration consequences, or other legal consequences if she left their employment); *Bradley*, 390 F.3d at 155 (noting distinction between "merely abusive employers" and employers who "deliberately sought to compel forced labor"); *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014) (noting that "we should not— without a clear expression of Congressional intent—transform a statute passed to implement the Thirteenth Amendment against slavery or involuntary servitude into one that generally makes it a crime for a person in *loco parentis* to require household chores, or makes child abuse a federal crime.").

Finally, the "scope of the statute is narrowed by the requirement of *scienter*." *U.S. v. Dann*, 652 F.3d 1160, 1170 (9th Cir. 2011) (citing *Calimlim*, 538 F.3d at 711-12). "The linchpin of the serious harm analysis under § 1589 is not just that serious harm was threatened but that the employer intended the victim to believe that such harm would befall her." *Id. See also Muchira*, 850 F.3d at 618.

In response to the Motion for Summary Judgment, the Sacketts primarily delineate what services and goods, including shelter, sustenance and care, they provided Plaintiffs, and attribute the care and provisions to their benevolence. The Sacketts' assertions might be relevant to Plaintiffs' claims for unjust enrichment or breach of contract, pled in the alternative, but they are not relevant to liability under the TVPRA. Only one sentence in the Response is relevant to the TVPRA claim: "I nor the Sackett Family did not employ any Echon family or ask them to work or give any job or any task of any kind to the Echon family [sic]." [#110 at 3]. While the Sacketts do not proffer admissible evidence to corroborate their assertions, the record includes their deposition testimony in its entirety, *see* [#104-21, #104-22], and the court may consider any materials in the record. Fed. R. Civ. P. 56(c)(3).

I pause to acknowledge the seriousness of the allegations, as well as the status of the Sacketts as *pro se* litigants. The ordeal Plaintiffs describe and attribute to the Sacketts might not include the severity of treatment, physical abuse, and duration of punishment presented in *Calimlim* and *Sabhnani*; however, "the TVPA not only protects victims from the most heinous human trafficking crimes, but also various additional types of fraud and extortion leading to forced labor." *Nuñag-Tanedo*, 790 F. Supp. 2d at 1145 (citing *Calimlim*, 538 F.3d at 711-14). *See also Panwar v. Access Therapies, Inc.*, 975 F. Supp. 2d 948, 958 (S.D. Ind. 2013) (denying motion to dismiss as to TVPA claim based on plaintiff's allegations of "non-physical forms of

coercion and threats of serious financial harm").  The court must consider whether the threat, seen from the vantage point of a reasonable person in the place of the victim, is sufficiently serious to compel the person to remain.  *Id.* (citation omitted).  *See also Dann*, 652 F.3d at 1171 ("someone is guilty of forced labor if he intends to cause a person in his employ to believe that if she does not continue to work, she will suffer the type of serious harm—physical or nonphysical, including psychological, financial, reputation harm—that would compel someone in her circumstances to continue working to avoid that harm.").  Additionally, the victim's acquiescence must be "*objectively reasonable* under the circumstances."  *Muchira*, 850 F.3d at 618 (emphasis in original) (internal quotation marks and citation omitted).

Plaintiffs attest that the Sacketts repeatedly threatened to kick them out of the home and/or have them deported if Plaintiffs did not work and similarly do as the Sacketts instructed.  There is no indication in Plaintiffs' testimony that they had reason to believe the Sacketts could not effectuate the threats, or that they would not be subject to deportation; indeed the Echons attest they believed Leonida could have them deported because she and her husband had sponsored them.  Additionally, Plaintiffs testify that Leonida Sackett told them they owed her and her husband a large debt that could be paid only through free labor, but she did not state the amount of the debt or explain the temporal terms for repaying the debt.  *See Dann*, 652 F.3d at 1171 ("For an immigrant without access to a bank account and not a dollar to her name, a juror could conclude that the failure to pay her—and thus the lack of money to leave or live—was sufficiently serious to compel [the immigrant] to continue working.").  Esmeraldo and Maribel testify that they received no money and they routinely lacked sufficient food; they did not speak English well, and they were entirely dependent on the Sacketts for lodging, utilities, and transportation; and the Sacketts held Maribel and the Echon sons' residency papers for over a

year. Plaintiffs attest that, despite their requests, the Sacketts refused to allow them to find paying jobs, and in many instances forbade them from speaking with anyone in the community. However, the Sacketts' testimony under oath, summarized in the previous section, directly contradicts almost all of Plaintiffs' allegations. And while this court is cognizant that defendants generally cannot avoid summary judgment simply by offering uncorroborated, self-serving and conclusory statements, the court may and should consider Defendants' statements made under oath during a deposition and based on their own personal, firsthand knowledge. *See Cox v. Lockheed Martin Corp.*, No. 11-CV-01479-PAB-BNB, 2013 WL 140624, at *4 (D. Colo. Jan. 11, 2013), *aff'd*, 545 F. App'x 766 (10th Cir. 2013).

Accordingly, this court finds that the claim and the competing evidence present precisely the sort of factual dispute that should be resolved by a jury, and that Plaintiffs Esmeraldo Echon and Justin Echon have failed to carry their burden. Thus this court respectfully recommends that the Motion for Summary Judgment as to this claim be DENIED.

### B. Claim Three: Violation of the Colorado Minimum Wage of Workers

As Plaintiffs state in their Motion for Summary Judgment, they may recover under this claim if they were: (1) employees (2) receiving less than the legal minimum wage (3) applicable to such employee. Colo. Rev. Stat. § 8-6-118. *See also Kennett v. Bayada Home Health Care, Inc.*, 135 F. Supp. 3d 1232, 1238 (D. Colo. 2015) (noting that the Colorado "Minimum Wages of Workers Act" charges the Director of the Colorado Division of Labor with the determination of "adequate" minimum wages for workers in covered industries). An "employee" is "any person performing labor or services for the benefit of an employer in which the employer may command when, where, and how much labor or services shall be performed." 7 Colo. Code Regs. § 1103-1:2. *See also Menocal v. GEO Group, Inc.*, 113 F. Supp. 3d 1125, 1129 (D. Colo.

2015).  For the reasons discussed above with respect to the TVPRA claim, I find that a genuine issue of material fact exists as to whether Plaintiffs are employees and I RECOMMEND that the Motion for Summary Judgment as to this claim be DENIED.[10]

### C.  Claim Four:  Violation of the Colorado Wage Claim Act ("CWCA")

The Colorado Wage Claim Act governs the timely payment of wages and provides for judicial relief when wages are not paid.  In particular, the CWCA allows an employee "to sue his or her former employer for earned wages and other compensation the employer has refused to pay."  *Lester v. Career Bldg. Acad.*, 338 P.3d 1054, 1058 (Colo. App. 2014).  *See also* Colo. Rev. Stat. § 8-4-109.  The CWCA defines "employer" as "every person, firm, partnership, association, corporation…employing any person in Colorado," and "employee" as "any person…performing labor or services for the benefit of an employer in which the employer may command when, where, and how much labor or services shall be performed."  Colo. Rev. Stat. § 8-4-101(5)-(6).  For the reasons discussed above with respect to the TVPRA claim, I find that a genuine issue of material fact exists as to whether Plaintiffs are employees and I RECOMMEND that the Motion for Summary Judgment as to this claim be DENIED.

## II.  Common Law Claims (Pled in the Alternative)

### A.  Claims Five and Six:  Breach of Contract, or, in the alternative, Breach of Contract, Third Party Beneficiary

These two claims arise out of the Affidavit of Support (USCIS Form I-864) that the Sacketts signed for Plaintiffs, and by which the Sacketts identified themselves as sponsor and

---

[10] The Colorado Minimum Wage Order applies to four industries: (1) Retail and Service; (2) Commercial Support Service; (3) Food and Beverage; and (4) Health and Medical.  7 Colo. Code Regs. 1103–1:1.  *See also Menocal*, 113 F. Supp. 3d at 1129.  Plaintiffs assert their work qualifies as work performed within the Retail and Service industry, which covers businesses that sell to the consuming public, and that generate 50% or more of its annual dollar volume of business from such sales.  [#104 at 16 (citing 7 Colo. Code Regs. 1103–1:2(a))].

joint sponsor of Plaintiffs. *See* [#104 at 27-28]. U.S. Citizens applying for lawful permanent resident status for immediate relatives must provide an Affidavit of Support for each applicant, agreeing "to provide support to maintain the sponsored alien at an annual income that is not less than 125 percent of the Federal poverty line during the period in which the affidavit is enforceable." 8 U.S.C. § 1183a(a)(1); 8 C.F.R. § 213a.2(b)(1) ("The person who filed a relative…petition, the approval of which forms the basis of the intending immigrant's eligibility to apply for an immigrant visa or adjustment of status as an immediate relative or a family-based immigrant, must execute an affidavit of support on behalf of the intending immigrant."). Once the sponsored immigrant enters the United States and obtains legal permanent residency, the Affidavit of Support "is legally enforceable against the sponsor by the sponsored alien, the Federal Government, any State…or by any other entity that provides any means-tested public benefit." *See* 8 U.S.C. §§ 1183a(a)(1)(B), (e)(1); 8 C.F.R. § 213a.2(d) ("The sponsored immigrant, or any Federal, State, or local governmental agency or private entity that provides any means-tested public benefit to the sponsored immigrant after the sponsored immigrant acquires permanent resident status, may seek enforcement of the sponsor's obligations through an appropriate civil action."). *See also Wenfang v. Mund*, 748 F. Supp. 2d 958, 962 (W.D. Wisc. 2010), *affirmed in part and reversed in part by Lie v. Mund*, 686 F.3d 418 (7th Cir. 2012); *Younis v. Farooqi*, 597 F. Supp. 2d 552, 554 (D. Md. 2009); *Shumye v. Felleke*, 555 F. Supp. 2d 1020, 1023 (N.D. Cal. 2008); *Schwartz v. Schwartz*, Case No. CIV-04-770-M, 2005 WL 1242171, at *1-2 (W.D. Okla. May 10, 2005).

The sponsor's obligation to support the sponsored immigrant at the requisite income level continues until one of the following conditions is met: the sponsor dies; the sponsored immigrant dies; the sponsored immigrant becomes a U.S. citizen; the sponsored immigrant permanently

leaves the United States; or the sponsored immigrant receives credit for forty qualifying hours of work. See 8 U.S.C. §§ 1183a(a)(2), (3); 8 CFR 213a.2(e)(2)(i). A sponsor's failure to support the sponsored immigrant consistent with the obligations set forth in the Affidavit of Support creates a cause of action for breach of contract by which the sponsored immigrant may sue for damages "that would put plaintiff[s] in as good a position as [they] would have been had the contract been performed." *Shumye*, 555 F. Supp. 2d at 1024. *See also* 8 U.S.C. § 1183a(c). To determine the question of breach, and damages if necessary, courts compare the plaintiff's annual income for the particular years at issue against the 125 percent poverty threshold for each year. *Shumye*, 555 F. Supp. 2d at 1024-25. The sponsor and joint sponsor, if applicable, may also be liable for legal fees and other costs of collection. 8 U.S.C. §§ 1183a(c).[11]

It is undisputed that the Sacketts signed and submitted Affidavits of Support on behalf of Plaintiffs in their bid for citizenship. *See* [#104-6]; *see also* [#1 at ¶¶ 23, 24, #11 at ¶¶ 23, 24]. Defendants signed these forms on September 24, 2010 and October 1, 2010, [#104-6], and Plaintiffs thereafter received their Legal Permanent Resident status and came to the United States

_____

[11] Plaintiffs reference a split in authority as to whether the sponsored immigrant is a party or a third-party beneficiary to the contract created by the Affidavit of Support. [#104 at 27 (comparing *Younis*, 597 F. Supp. 2d at 554; *Shumye*, 555 F. Supp. 2d at 1023; *Schwartz*, 2005 WL 1242171, at *1, *with Erler v. Erler*, 824 F.3d 1173, 1175 (9th Cir. 2016), *Wenfang*, 748 F. Supp. 2d at 962)]. This court is inclined to agree with the Ninth Circuit that "[o]nce executed, the affidavit becomes a contract between the sponsor and the U.S. Government for the benefit of the sponsored immigrant…," *Erler*, 824 F.3d at 1175, and thus a third-party beneficiary theory of liability is more appropriate. Indeed, the Sacketts, not the Echons, signed the Affidavits of Support. *See* [#104-6 at 10, 11]. *See also C-470 Joint Venture v. Trizec Colorado, Inc.*, 176 F.3d 1289, 1293 (10th Cir. 1999) ("A third party beneficiary is created if the parties to the agreement intended to benefit a non-party") (citing *E.B. Roberts Constr. Co. v. Concrete Contractors, Inc.*, 704 P.2d 859, 865 (Colo. 1985) (en banc)); *Coleman v. Mountain Mesa Uranium Corp.*, 240 F.2d 12, 16 (10th Cir. 1956) ("If ... [plaintiff] was a third party beneficiary [,] he could sue for the enforcement of his rights under the contract, although he was not a party thereto or was not mentioned therein."). However, this court need not reach the question as to whether Plaintiffs are parties to or third party beneficiaries of the contract; the court is satisfied that the Sacketts, having signed the Affidavits of Support, are liable for providing the requisite support, regardless of the precise theory of recovery.

with the sponsorship of Defendants.  Additionally, it is undisputed that during the time at issue in this lawsuit, the Sacketts supported Plaintiffs as follows: monthly rent in no more than the amount of $750, [#104-22 at 76:10-11]; food valued at no more than $12,500, [#104 at 29 (citing #51 at ¶ 25)]; transportation for Justin Echon and Plaintiffs' minor son to and from school, valued at no more than $1,600, [*id.* (citing #51 at ¶ 30)]; and monthly payment for utilities valued at no more than $300, [#104 at 5, ¶ 12].  Additionally, Plaintiffs account for the $1,400 that Esmeraldo Echon earned with the construction job in South Dakota in 2012, [#104-18 at ¶¶ 116, 117], and the value of the food stamps they received from Otero County in 2013 ($1,888) and 2014 ($4,412). *See* [#104-3].  Mrs. Sackett testified that in 2011, she gave Esmeraldo Echon $3,500. [#104-22 at 265:21-22].  But the Sacketts have not introduced evidence of any additional monetary support given in furtherance of their contractual obligations as sponsors during the years of 2012 through 2014, and indeed, Mrs. Sackett confirmed in her testimony that Defendants provided no additional monetary support after 2011.  [*Id.* at 265:18-25, 266].  To the extent Mrs. Sackett testified that she could not recall giving Plaintiffs any other money, *see* [*id.* at 266:16-25], this court notes that Defendants failed to respond to Interrogatory No. 8, which asked Defendants to "list all times you financially supported any of the Plaintiffs or Jeffrey Echon .. [including] the nature of the support as well as the amount expended or given."  Defendants additionally failed to produce written evidence of any other support provided during the years 2012 through 2014. Accordingly, this court finds that Defendants should be precluded from offering such evidence now or at trial.

One hundred percent of the Federal Poverty Guidelines ("FPG") for a household of four

was $23,050 in 2012, $23,550 in 2013, and $23,850 in 2014.[12]  Accordingly, 125 percent of the

FPG for Plaintiffs' household during those years was $28,812.50, $29,437.50, and $29,812.50,

respectively.  Plaintiffs assert their annual household income was no greater than $14,896 for

2012, $22,132 for 2013, and $19,595 for 2014.  [#104 at 29].  Plaintiffs contend, and this court

agrees, that the evidence demonstrates the Sacketts failed to provide for them at the mandated

125 percent of the FPG during 2012, 2013, and 2014.  The difference between Plaintiffs'

household income and 125 percent of the FPG is $13,916.50 for 2012, $7,305.50 for 2013, and

$10,217.50 for 2014, for a total of **$31,439.50**.  Based on the record before it, this court finds

that Plaintiffs have carried their burden as to Claim Six and RECOMMENDS that summary

judgment be granted in favor of Plaintiffs and against Defendants as to this claim.[13]

### B.  Claim Seven:  Unjust Enrichment

Finally, Plaintiffs contend they each worked for the Sacketts and that the Sacketts

"benefitted from the many hours of work Plaintiffs performed for them without payment."

[#104 at 25].  To recover for unjust enrichment, Plaintiffs must show that "(1) a benefit was

conferred on the defendant by the plaintiff; (2) the benefit was appreciated by the defendant; and

(3) the benefit was accepted by the defendant under such circumstances that it would be

inequitable for it to be retained without payment of its value."  *Does v. Rodriguez*, No. 06–cv–

---

[12] *Annual Update of the HHS Poverty Guidelines*, "2012 Poverty Guidelines for the 48 Contiguous States and the District of Columbia," 77 FR 4034-02, 2012 WL 219087 (Jan. 26, 2012); *Annual Update of the HHS Poverty Guidelines*, "2013 Poverty Guidelines for the 48 Contiguous States and the District of Columbia," 78 FR 5182-01, 2013 WL 246458 (Jan. 24, 2013); *Annual Update of the HHS Poverty Guidelines*, "2014 Poverty Guidelines for the 48 Contiguous States and the District of Columbia," 79 FR 3593-01, 2014 WL 218286 (Jan. 22, 2014).

[13] Plaintiffs assert that "[a]t least four others lived in the same house as [them]," and Leonida Sackett "charged some of these family members $700 per month for rent."  [#104 at 29 n.15]. Plaintiffs specify that they adopt "these amounts for purposes of establishing liability (not for damages)."  [*Id.*]  Accordingly, this court's finding extends to liability only, and recommends that the issue of damages be reserved for the jury.

00805–LTB, 2007 WL 684117, at *5 (D. Colo. Mar. 2, 2007) (quoting *Humphrey v. O'Connor,* 940 P.2d 1015, 1021 (Colo. App. 1996). "The scope of this remedy is broad ... with its application guided by the underlying principle of avoiding the unjust enrichment of one party at the expense of another." *Id.* Given the genuine issues of material fact identified above, I find that the undisputed evidence does not support an award of summary judgment in favor of Plaintiffs on the issue of whether Defendants were unjustly enriched by Plaintiffs' labor. Accordingly, this court RECOMMENDS that summary judgment as to Claim 7 be DENIED.

**CONCLUSION**

Based on the reasons set forth herein, this court respectfully **RECOMMENDS** that:

(1)     Plaintiffs' Motion for Summary Judgment [#106] be **GRANTED IN PART and DENIED IN PART**;

(2)     The court **GRANT IN PART and DENY IN PART** Plaintiffs' request that certain proposed facts be accepted as true;

(3)     The court **GRANT** the Motion as to Claims Five and Six, pled in the alternative, with respect to liability;

(4)     The court **DENY** the Motion as to Claims One, Three, Four, and Seven; and

(5)     The court **DISMISS** Claim Two (arising under the Fair Labor Standards Act). [14]

---

[14] Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a

(6)     The Parties and counsel are reminded that the Final Pretrial Conference in this matter is set for **September 29, 2017 at 10:00 A.M.** in Courtroom C-204, Second Floor, Byron G. Rogers United States Courthouse, 1929 Stout Street, Denver, Colorado. The proposed Pretrial Order is due seven (7) days prior to the Final Pretrial Conference.  Please remember that anyone seeking entry into the Byron G. Rogers United States Courthouse will be required to show valid photo identification. *See* D.C.COLO.LCivR 83.2(b).

DATED:  September 20, 2017                          BY THE COURT:

s/ Nina Y. Wang
Nina Y. Wang
United States Magistrate Judge

---

judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).