1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

2

Civil Action No. 14-CV-03420-PAB

3

4  ESMERALDO VILLANUEVA ECHON, JR.,
MARIBEL ECHON, and
JUSTIN ECHON,

5

6      Plaintiffs,

vs.

7

WILLIAM SACKETT and LEONIDA SACKETT,

8

9      Defendants.

_____

10

REPORTER'S TRANSCRIPT

11  Trial Preparation Conference

12  _____

13      Proceedings before the HONORABLE PHILIP A. BRIMMER,

14  Judge, United States District Court for the District of

15  Colorado, commencing at 1:46 a.m., on the 26th day of January,

16  2018, in Courtroom A-701, United States Courthouse, Denver,

17  Colorado.

18

19

20

21

22

23

24  Proceeding Recorded by Mechanical Stenography, Transcription
Produced via Computer by Janet M. Coppock, 901 19th Street,

25      Room A-257, Denver, Colorado, 80294, (303) 893-2835

2

|    |                                                                          |
|----|--------------------------------------------------------------------------|
| 1  | APPEARANCES                                                              |
| 2  | Matthew Robert Baca and Jenifer Cari Rodriguez of                        |
| 3  | Colorado Legal Services, 1905 Sherman Street, Suite 400,                 |
| 4  | Denver, CO 80203, appearing for the Plaintiffs.                          |
| 5  | The Defendants, William and Leonida Sackett, appeared                    |
| 6  | pro se.                                                                   |
| 7  | *   *   *   *   *                                                        |
| 8  | PROCEEDINGS                                                              |
| 9  | THE COURT:  The matter before the Court is Esmeraldo                    |
| 10 | Villanueva Echon and others versus William and Leonida Sackett.          |
| 11 | This is Civil Case 14-CV-3420.                                           |
| 12 | I will take entries of appearance, please.                               |
| 13 | MR. BACA:  Good afternoon, Your Honor.  Matt Baca and                   |
| 14 | Jenifer Rodriguez for the plaintiffs.                                     |
| 15 | THE COURT:  All right.  And can you indicate for the                    |
| 16 | record who is present with you at counsel table?                         |
| 17 | MR. BACA:  Yes, Your Honor.  We have Justin Echon,                      |
| 18 | Maribel Echon and Esmeraldo Echon, Junior, who are plaintiffs,           |
| 19 | as well as Daniel Pingoel, who is an interpreter.                        |
| 20 | THE COURT:  Who is the interpreter?                                      |
| 21 | MR. BACA:  Daniel Pingoel.                                              |
| 22 | THE COURT:  How is it spelled?                                          |
| 23 | THE INTERPRETER:  P-I-N-G-O-E-L.                                        |
| 24 | THE COURT:  Okay.  Good afternoon.                                      |
| 25 | I understand the equipment is not working, so if you                     |

1   need to elevate your voice a little louder than you otherwise

2   do for your clients or the plaintiffs to hear, you can do that.

3              *THE INTERPRETER:*  I will do so, Your Honor, as

4   necessary.

5              *THE COURT:*  Great.  Thank you and good afternoon.

6              Entry of appearance on behalf of defendants?

7              *MR. SACKETT:*  William Sackett, Your Honor, and Leonida

8   Sackett.

9              *THE COURT:*  And you are representing yourselves in

10  this case; is that correct?

11             *MR. SACKETT:*  Yes, Your Honor.

12             *THE COURT:*  Thank you.  And good afternoon to both of

13  you.

14             We are here for a trial preparation conference in this

15  matter.  We are set for a jury trial, three days, beginning on

16  February 12th of 2018.

17             So what we are going to do is, first of all, we are

18  going to go through the motions that are pending, and I am

19  going to rule on those motions.  I will allow for some limited

20  argument on the motions.  And then after that I am going to

21  talk about our schedule on the first day of trial and for the

22  rest of the trial and talk about some specific issues, like

23  jury selection, witnesses, exhibits, that type of thing, okay?

24             So first of all, why don't we take up the motions *in*

25  *limine* that have been filed.  And the first one that we'll talk

 1   about is the motion *in limine* No. 1, this is Docket No. 160,

 2   and that has to do with evidence inconsistent with facts the

 3   Court has deemed established.

 4        So on this particular motion, I will hear first of all

 5   from the defendants, if you have anything additional as to this

 6   particular motion, the gist of which is that Judge Wang has

 7   already entered certain orders which I have approved.  And so

 8   as a result, there is certain facts which cannot be contested

 9   by the defendants at the trial.

10        Anything else on that on behalf of defendants?

11        *MR. SACKETT:*  No, sir, Your Honor.

12        *THE COURT:*  What's that?

13        *MR. SACKETT:*  No, sir.

14        *THE COURT:*  Okay.  That motion is granted.

15        So my law clerk, Ms. Goodrich-Schlenker will pass out

16   an instruction that I anticipate giving, and that will

17   contain -- I think the plaintiffs had a good idea, which the

18   instruction will contain both stipulated facts and also these

19   ones that the Court has established.  It won't have admitted

20   facts.  The plaintiffs will have to figure out a different way

21   to get those in front of the jury, but I anticipate giving an

22   instruction along the following lines.

23        And normally what I would do with a stipulation, if

24   you had stipulated facts, you would follow my practice

25   standards and you can admit it to the jury.  Here, because we

 1  have an established fact that's not going to be agreed to by

 2  one side, it will probably come through an instruction.  So

 3  what I'll probably do -- I don't read any stipulations to the

 4  jury.  I don't do that.  But what I will probably do is allow

 5  the plaintiffs to display this to the jury, and I would

 6  anticipate that this is going to be an instruction they

 7  receive.

 8         So during the course of the trial, you could probably

 9  ask for permission to display this to the jury so the jury can

10  see during the trial what these particular facts are, all

11  right?  All right.  So I grant that motion.

12         Let's turn our attention now to motion *in limine*

13  No. 2.  This motion *in limine* indicates -- the gist of it is

14  that the defendants have failed to disclose documents except

15  after the close of discovery, and they mention a few different

16  categories of that.

17         Let me, first of all, ask the plaintiffs, so for

18  instance, Docket No. 136, that's just a witness list -- sorry,

19  an exhibit list.  I assume that what you're talking about is

20  that that -- to the extent that there are actual documents that

21  fit those descriptions, because those haven't been produced,

22  they would be subject to exclusion.

23         *MR. BACA:*  Yes, that's right, Your Honor.  Also the --

24  I think everything that's listed in the docket has either

25  appeared electronically or has been filed conventionally.  So I

1   think the defendants did deliver paper copies of the exhibits

2   they were going to use.

3         THE COURT:  Yeah, under one category, but some of

4   these other things are a little bit different.  For instance,

5   Exhibit O, which is -- which was filed in Docket No. 153, that

6   appears to be a recently created list of locations where

7   various plaintiffs worked.

8         Now, it's true that if defendants were to try to just

9   admit some list that they recently created, it might not get

10  in.  But it could be like a summary exhibit or there may be

11  some conceivable -- this doesn't really sound like it's

12  something that was created before which wasn't produced for

13  whatever reason.

14        MR. BACA:  I think that's exactly right, Your Honor.

15  I think the things that weren't disclosed were primarily their

16  Exhibit A and then the photographs that they produced, and

17  there are some other lists and things they didn't produce

18  earlier as well.

19        I think, yeah, Exhibit O maybe could be a summary.  I

20  don't think there are any documents that will be in the record

21  that it could be purporting to summarize.

22        THE COURT:  They would have to get it in through some

23  other rule.  Okay.  And then, for instance, Docket No. 157, and

24  I am not sure exactly what that is.  To the extent it purports

25  to be some previously dated contract, then it would seem to

1    fall within, you know, existed but wasn't produced.  To the

2    extent that it might be recently created memorial of the

3    contract term, maybe it could get in.  But once again it would

4    have to come in through some other -- satisfying some other

5    terms.

6            All right.  Mr. Sackett or Mrs. Sackett, response to

7    motion *in limine* No. 2 on the documents?  Do you have anything

8    more to say on that issue?

9            *MR. SACKETT:*  Your Honor, I can hardly hear what you

10   said.

11           *THE COURT:*  Okay.

12           *MR. SACKETT:*  I have a new set of hearing aids, but

13   the sound is sometimes --

14           *THE COURT:*  Why don't you try sitting towards the back

15   of the table and see if the speakers pick up a little bit

16   better there.  Just try that first.  Try sitting there.  Is

17   that any better?

18           *MR. SACKETT:*  That's a little bit better, Your Honor.

19           *THE COURT:*  Why don't you sit there and then, yeah,

20   that microphone will help me hear you.  It won't help you hear

21   me, but I'll try to keep my voice up.

22           So here is something that the plaintiffs will have to

23   take into account, and that is if Mr. Sackett needs the

24   headphones, then you won't be able to use the headphone system.

25   You'll have to supply your own system in some respect.

1         *MR. BACA:*  Okay.  We would request that we would get

2    priority as plaintiffs.

3         *THE COURT:*  You don't.  He is accommodated as a

4    disability.  You wouldn't be.

5         But Mr. Sackett, what I want you to try to do is

6    between now and trial, see if you can make sure to get your

7    hearing aids adjusted because, actually, I think I am talking

8    pretty loud.  So you might need to make sure you have got your

9    hearing aids properly adjusted.

10        *MR. SACKETT:*  Okay, but I can't hear right now.  What

11   you are saying I can't hear for some reason.

12        *THE COURT:*  They aren't working today.

13        *MR. BACA:*  Your Honor, it might be worth a try.  I am

14   not sure if it was the interpret -- I am not sure if it was the

15   interpretation cord or it was the headset, so it might be worth

16   it.

17        *THE COURT:*  Yeah, we will try it.  You don't have to

18   do anything.  Just try them on.

19        Can you hear anything, Mr. Sackett?  Anything coming

20   through?

21        *COURT DEPUTY CLERK:*  We are having issues with the

22   static.  That's what he is hearing.

23        *MR. SACKETT:*  Nothing works on this thing.  I can't

24   get it to work.

25        *THE COURT:*  Okay.  Then, Mr. Sackett, why don't you

```
 1    put your hearing aids back in.

 2          MR. SACKETT:  It seems the acoustics in this building

 3    are actually poor.

 4          THE COURT:  The acoustics are actually good in these

 5    courtrooms, so that's why I am suggesting, Mr. Sackett, see if

 6    you can have your hearing aids checked.  Can you hear me now?

 7          MR. SACKETT:  I can hear you, yes, sir.

 8          THE COURT:  Okay.  Good.  If you are having more

 9    problems, let me know right away.  And there is one other thing

10    that we can do, namely, bring up a computer that would scroll

11    what I am saying that you could read.

12          MR. SACKETT:  Okay.  That would be fine.

13          THE COURT:  But I would prefer to avoid that because

14    we would have to take a break, and I have got a hearing after

15    this too.

16          MR. SACKETT:  It seems as though maybe you was talking

17    a little too fast for me or something.  Maybe I don't

18    understand, but I can hear you right now if I am standing up

19    here.

20          THE COURT:  I will try to talk a little bit more

21    slowly.

22          MR. SACKETT:  Thank you, sir.

23          THE COURT:  So, Mr. Sackett, where we left off is that

24    you were going to respond to the second motion *in limine*, the

25    one to exclude any exhibits that you failed to produce earlier
```

1   in the case.

2            Any further -- any response to that one?

3        *MR. SACKETT:*  I don't know what exhibit he was

4   referring to.  All exhibits I turned in to you all was correct,

5   honest, and with all of the preparation I had to offer.

6        *THE COURT:*  Right.  And what the plaintiffs are saying

7   is that you did that too late.  They asked you for that a long

8   time ago.  You never produced them.  And now, given that you

9   only produced them since November after discovery was closed,

10  you should be precluded from using any of them.

11       *MR. SACKETT:*  Whenever we was having discovery way

12  early, a long time ago, I asked Mr. Stewart, I said, "Is there

13  anything more that you want from me?"  His answer was, "There

14  is nothing more that we need or that we want."  I have a

15  witness that will swear to that and was standing right there

16  with me, so that is absolutely true.

17           There was nothing more that they wanted in preparation

18  of the trial.  And they have been using this 500 times -- well,

19  maybe not that much, but they have been using this over and

20  over and over and over, and it is absolutely a lie.  There is

21  no truth whatsoever in it, and I will swear to that fact.

22       *THE COURT:*  Okay.

23       *MR. SACKETT:*  They have been questioning this over and

24  over and over.  The only thing I didn't send them, and I told

25  them I wasn't going to send it, was an immigration paper on

 1   account of one of their sons -- or one of their brothers over

 2   in the Philippines asked me if I would stay care of their

 3   child, bring him over here.  And I said if I have got to do all

 4   this, give you this information on this immigration deal, I am

 5   not going to give it to you because I want to bring that child

 6   over here sometime in the future.

 7        That's what I told them, and that's true, and that's

 8   still true today.  I am not going to give it to them.  I didn't

 9   sign this document.  Leonida signed it, but I didn't sign it.

10   They've hounded me over and over and over on this document, and

11   I don't think it's quite fair.

12        I would like to know if these are licensed attorneys

13   for the state of Colorado also while I am at it.  They have

14   been telling me so many things that's just not quite right.  It

15   doesn't seem like -- you know, they started out telling me that

16   I was kidnapping, human trafficking.  That's how they got it

17   into your court to begin with.  If they hadn't got it into your

18   court, it wouldn't have amounted to nothing, but they got it

19   into this court by lies --

20        THE COURT:  Yeah, we are not going to go into that.

21   That's another -- that's a subject of another motion *in limine*.

22        So the question here is anything else on their motion

23   for you to be precluded from using as exhibits any of those

24   documents that you have filed over the last few months?

25        MR. SACKETT:  Yes.  There is a lot.

1        *THE COURT:*  Well, here is the question.  Why shouldn't

2    the Court enforce the orders that as a sanction preclude you

3    from using information that you didn't disclose when you were

4    asked for it years ago?

5        *MR. SACKETT:*  I gave that information to them, Your

6    Honor.  I gave it to them.  It should be included.  It should

7    be included.  This exhibit is an honest and fair exhibit, and I

8    don't think the Court ought to take advantage of someone that

9    is per se against three or four lawyers like they've got.  I

10   don't think that that's fair.

11       I don't think that's what the Court intended and I

12   don't think that's what you intend, sir.  And I don't -- I may

13   not -- I got a sanction and I don't think the sanction was

14   fair, it was used, but a *limine* motion of some kind that I

15   didn't understand.

16       And I tell you something else.  I seen it the other

17   night on television, a United States nominee for the Supreme

18   Court, and he was asked the same question.  And he said, "I do

19   not have that answer right now, sir."  The Congress was

20   questioning him for a job in the United States Supreme Court,

21   and I feel that that's kind of the way these people are trying

22   to do me.

23       So I think this here sanction that you put against me

24   or Judge Wang put against me, I think it's unfair.  I don't

25   think it has anything to do with this case other than the fact

1   that it's a lawyer deal.  And that's what I think, Your Honor.

2           *THE COURT:*  Okay.  The motion *in limine* is going to be

3   granted.  So the plaintiffs -- I mean, sorry, the defendants

4   have been sanctioned by -- recommendation was made by Judge

5   Wang, and the defendants were precluded from offering evidence

6   that had not been disclosed in discovery contradicting

7   testimony.

8           And here, you know, this was -- the discovery process

9   was dragged on for a long time because defendants did not

10  produce the documents.  And after Judge Wang made that

11  recommendation, then defendants had the opportunity to make

12  objections, and then I approved of her order.

13          The documents that were produced just since like

14  November, including the 200 pages that were conventionally

15  submitted, appear to be all documents which are in violation of

16  that order; and as a result, the Court finds no reason not to

17  enforce that against the defendants.

18          You simply can't -- and if defendants are choosing to

19  represent themselves, they have to follow the rules.  And if

20  the rules aren't followed, then there are consequences.

21  Everyone knows that.  And as a result, there is no unfairness

22  here.  These documents should have been produced earlier.  And

23  because they weren't, by them being produced late now, I find

24  that they would severely prejudice the plaintiffs because the

25  plaintiffs have not had an opportunity to depose either of the

1  defendants about them and, as a result, learn information that

2  would be important to their clients.

3       So that motion *in limine* will be granted.  So any

4  documents that are part of that group or any other documents

5  that haven't been produced earlier will not be allowed in the

6  trial, all right?

7       MR. SACKETT:  What documents does that include, Your

8  Honor?

9       THE COURT:  Anything that you filed -- when were the

10  first of these documents filed?  I think the main one,

11  Mr. Sackett, is November 15th in Docket No. 143?  I think

12  that's when you filed a large group of documents, and so it

13  would include those.

14       I just talked at the beginning of this motion about

15  certain other ones that you filed, like Exhibit O.  I am not

16  excluding that at this time.  That was in Docket No. 153.  That

17  was like a list that you created.  But, for instance, Docket

18  No. 157, which is Exhibit P, if that's a contract that was

19  entered into back in 2014 which you didn't produce before --

20       MR. SACKETT:  Your Honor --

21       THE COURT:  Don't interrupt -- then that one will be

22  excluded too.  Go ahead.

23       MR. SACKETT:  Your Honor, that document was mailed to

24  the prosecution right at the start way early.  It was a copy of

25  the original document.  And I mailed it to them and they have

1   it somewhere.  I don't know whether they lost it or what

2   happened, but I sent them a copy of that.  And I can't remember

3   even what year, but it was a long time ago.

4         THE COURT:  Well, if you can show me evidence that you

5   produced that earlier --

6         MR. SACKETT:  I have a copy of that document right

7   here.

8         THE COURT:  Response, Mr. Baca?

9         MR. BACA:  We are talking about Exhibit P?

10        THE COURT:  I think we are talking about Pages 4 and 5

11  of Exhibit P.

12        MR. SACKETT:  You have a copy of this already.  I

13  mailed it to you a long time ago.

14        THE COURT:  Everything is addressed to me.  No side

15  conversations.

16        MR. SACKETT:  I am sorry.  I have a copy of this

17  document right here.

18        THE COURT:  I have got a copy of it, too.  The

19  question is whether you produced it in a timely fashion.

20        MR. SACKETT:  I produced it to them, yes, ma'am --

21  yes, sir.  Yes, Your Honor.

22        MR. BACA:  I have looked through our entire case file.

23  I don't recall ever seeing that in there.  I will check again,

24  but I will represent to the Court at this time that we never

25  had that, have never seen that.

1            THE COURT:  Check again.

2            He will check.  And, Mr. Sackett, if you have some

3     proof of having mailed it, then that will -- I'll allow you to

4     use that, but you need to show me something that was produced

5     earlier.

6            MR. SACKETT:  I don't have nothing to prove that I

7     mailed it except I have a witness that would swear that she

8     made a copy of it and copied it way back a long time ago.  And

9     I sent it to them.  Stewart, whatever his name was, he was the

10    one running for the defense and I know he got a copy of it.

11    It's absolutely true that he got a copy of it, and I mailed it

12    to him.

13           THE COURT:  Who is Stewart?

14           MR. BACA:  He is one of the prior attorneys on the

15    case, Your Honor.

16           THE COURT:  Okay.  Let's turn our attention to motion

17    in limine No. 3.  This is to exclude defendants' character

18    witnesses.

19           So, Mr. Sackett, what are these various -- it sounds

20    like some witnesses would testify to your character for

21    truthfulness, that you are an honest person; is that correct?

22           MR. SACKETT:  That's correct, Your Honor.

23           THE COURT:  And what else are they going to be talking

24    about, if anything?

25           MR. SACKETT:  Well, they are a reverend in the church

1    that we go to.

2         THE COURT:  I know who they are in terms of position,

3    but what else are they going to say that's relevant to the

4    case?

5         MR. SACKETT:  Well, they know the defendants.  They

6    knew them and they knew how they was treated.  And they went to

7    the church with the -- sometimes they went to church there, not

8    all the time.  Sometimes they went to church there.  And he

9    preached the church and his wife knows them and he knows them.

10   And they will testify to what happened and the way it happened

11   and stuff of that nature.

12        THE COURT:  The way what happened?

13        MR. SACKETT:  Well, they sued me.

14        THE COURT:  Well, they are not going to talk about

15   that, but what are they going to talk about that's relevant?

16        MR. SACKETT:  Well, I didn't bring my question list

17   with me, but I have several questions I am going to ask them.

18        THE COURT:  Such as?

19        MR. SACKETT:  Like was they mistreated?  Did they have

20   plenty of food?  Did they have access to food?  Was they

21   employed by me?  Did they have any -- did they see any

22   paychecks or anything that I wrote them, which I didn't.  I

23   never wrote them.  They was never employed and stuff of that

24   nature.

25        THE COURT:  Okay.  And as for the witnesses that are

1    mentioned in the motion *in limine*, can you point to anywhere

2    where you disclosed to the plaintiffs the subject matter of

3    their testimony?

4           *MR. SACKETT:*  I didn't tell him anything I was going

5    to ask, any questions I was going to ask or anything I was

6    going to ask, and because -- the reason I didn't is because the

7    lies they told to get this into federal court.  I was afraid

8    that they would tell their clients and prepare them and that

9    they would solicit their -- whatever they -- to help them in

10   doing it and the attorneys would be putting words in their

11   mouths.  And I thought if I give them any information at all,

12   it would be detrimental to my case, this case here, Your Honor,

13   so I didn't give them anything.

14          And the reason this was, the reason I didn't give them

15   anything like that is pure distrust.  I caught them.  And I got

16   times here that they give me the list and times of things.

17   I've got -- I've got information and stuff that they wasn't

18   even there at those times.

19          *THE COURT:*  Who wasn't?

20          *MR. SACKETT:*  Pardon?

21          *THE COURT:*  Who wasn't there?

22          *MR. SACKETT:*  The defense -- the prosecution, the

23   witnesses of the prosecution, the people that's suing me, the

24   Echon family.

25          *THE COURT:*  And they are the plaintiffs, not

1    prosecution.  Prosecution is a criminal case.

2         *MR. SACKETT:*  Okay.  I am sorry, Your Honor.

3         *THE COURT:*  You shouldn't use the term "prosecution."

4         *MR. SACKETT:*  Okay.

5         *THE COURT:*  Okay.  Anything else, Mr. Sackett?

6         *MR. SACKETT:*  Well, not that I can think of, but I

7    will need some information or some -- I will need permission to

8    bring some stuff into this Court that will prove that they

9    don't know what they were doing, that they never was employed

10   or never worked and stuff like that.  I will need permission to

11   bring some tools in here to prove that.

12        *THE COURT:*  It's possible that you could bring some

13   tools in, but you would have to tell me exactly what you're

14   talking about.

15        *MR. SACKETT:*  I am talking about two hoes, cultivator

16   shovel -- cultivator tools, not shovel, cans, metal, some metal

17   that was lost in the field and stuff of this nature.

18        *THE COURT:*  And what would you do with such a thing?

19        *MR. SACKETT:*  I have a demonstration of them.  I will

20   demonstrate to the Court and the jury that they know nothing

21   about farming or of any kind of employment that I have to do

22   with these tools.

23        *THE COURT:*  Well, how could you demonstrate their lack

24   of knowledge or --

25        *MR. SACKETT:*  I can ask questions that they can't

1   answer, Your Honor.

2          THE COURT:  Okay.  And why can't you do that with

3   photographs of these tools?

4          MR. SACKETT:  You want me to reveal the secret to what

5   I have?

6          THE COURT:  No, but I am just saying as opposed to the

7   actual tool, why couldn't you use a photograph of the tool and

8   do the same thing, ask them questions?

9          MR. SACKETT:  Well --

10          THE COURT:  Because I think you presume that they

11   don't know, they are not familiar with them.  So why wouldn't a

12   photo be sufficient?

13          MR. SACKETT:  Well, I suppose it probably might be,

14   but for the jury, I think it would be a dishonor to my case not

15   to have the actual piece of equipment, which is not very large.

16   I mean, it's quite small, like this.

17          THE COURT:  And what's that?  What is that?

18          MR. SACKETT:  The cultivator tool is quite small.

19          THE COURT:  Okay.

20          MR. SACKETT:  And in order to produce it and to

21   produce it so someone can actually see how it works and why it

22   works.

23          THE COURT:  But isn't your theory that they don't know

24   how it works?  So why is it important for the jury to

25   understand how it works?

1          *MR. SACKETT:*  Well, because I can explain to them how

2     it works, why it works.

3          *THE COURT:*  But why would the jury care?  If the

4     answer is, "I don't know how it works," why would the jury care

5     how it works?  I guess I don't quite understand the need for

6     it.

7          *MR. SACKETT:*  Well, the need for it is because it's a

8     functional tool and you have to see how it works.  A picture

9     won't show you how it works.  It will show you what it is, but

10    it won't show you how it works.  And I need a little table --

11    that one there will be fine -- a blackboard to demonstrate how

12    it works and why they didn't know why it worked and why, if

13    they worked on the farm, which I am a farmer, I have been

14    farming for 32 years, 32 -- 36 years, and if they worked for me

15    on the farm, they would absolutely know about these things.

16         *THE COURT:*  Okay.  And would you be using some of

17    these tools to illustrate your -- when you testify?

18         *MR. SACKETT:*  When I bring them into court for the

19    jury trial?

20         *THE COURT:*  Yeah, in other words, when you testify,

21    would you want to use some of those tools to demonstrate

22    something?

23         *MR. SACKETT:*  Certainly, certainly, I would, yes.

24         *THE COURT:*  Here is the deal.  You can do that,

25    Mr. Sackett, but you have to have a limited number, otherwise

1   the security guards aren't going to let you bring in too much,

2   but if you bring a few of them in and if the security guards

3   say no way, you can ask them to call up to my chambers, and

4   then someone from my chambers will come down and we'll take a

5   look at them.  And assuming that they are what you described,

6   we'll allow them to be brought up.

7          MR. SACKETT:  That would be perfectly fine with me,

8   sir.

9          THE COURT:  You can't admit them into evidence.  They

10  instead would be what we call demonstrative exhibits.  In other

11  words, the jury could see them, but they won't go back to the

12  jury, otherwise you will lose your tools.

13         MR. SACKETT:  That's all right.  I have more.

14         THE COURT:  Well, we are not -- we don't want them

15  either, but you can use them for demonstrative purposes.

16         Mr. Baca?

17         MR. BACA:  A couple things.  Actually, briefly, Justin

18  Echon has to use the restroom.  We were going to ask if he can

19  be excused without taking a recess.

20         THE COURT:  No problem.

21         MR. BACA:  The other thing, Your Honor, if I could

22  just briefly respond to the farm tools argument.  So that is

23  something we have objected to.  That's at ECF No. 140 and it's

24  Page 5.  I understand the Court's ruling --

25         THE COURT:  140, what's that?

 1          MR. BACA:  That was our objection to the defendants'

 2    exhibits.  So we filed a written objection to all defendants'

 3    exhibits.  I don't think I need to take the Court's time with

 4    oral argument about that today other than to flag that we, of

 5    course, as with the other --

 6          THE COURT:  Yeah, you would have the ability to

 7    object.

 8          MR. BACA:  Okay.

 9          THE COURT:  But it sounds like what he is saying is he

10    wants to use it to illustrate his own testimony.

11          MR. BACA:  Okay.  Thank you, Your Honor.

12          And then the other thing we wanted to address if we

13    are still on motion in limine No. 3 --

14          THE COURT:  We are.

15          MR. BACA:  So today is the first time we have heard

16    any hint that these witnesses would be talking about the

17    treatment of plaintiffs.  It's only been about the character

18    testimony.  Out of an abundance of caution, we did file the

19    complete deposition transcripts for both defendants and it's

20    simply not in there.  We did ask what these witnesses would be

21    testifying about.  So I think we are under Rule 37(c)(1), the

22    standard about substantial justification or harmlessness, and

23    it is not substantially justified and certainly harmful to have

24    this new subject matter for these witnesses.

25          THE COURT:  I understand your argument, but let's talk

1   about something else, and that is you claim that you're not

2   going to be challenging the Sacketts' truthfulness.

3        MR. BACA:  We are not challenging their character.

4        THE COURT:  I doubt it.

5        MR. BACA:  We are not challenging their character for

6   truthfulness.

7        THE COURT:  Show me one single case that premises the

8   ability of a person to use a character witness to rebut a

9   challenge to their truthfulness on the fact that the other side

10  didn't attack their general character.  I mean, no one attacks

11  anyone's general character for truthfulness.  They attack their

12  specific character for truthfulness by trying to contradict

13  their testimony or whatever.

14       MR. BACA:  And I think if that were the case, Your

15  Honor, there would be no need for Rule 608(a) because I think

16  in every case where there is a factual dispute, which is every

17  trial --

18       THE COURT:  No, it's not, because you can have a

19  position.  Both sides in a contract dispute can disagree

20  completely about whether the contract is breached, but that

21  doesn't mean, you know, you say that individual is a liar or

22  don't believe that person, but that's exactly what you're going

23  to be doing in this case.

24       MR. BACA:  We will be rebutting specific -- specific

25  things the defendants say, absolutely.

 1        *THE COURT:*  And when you cross-examine the Sacketts,

 2   you are not going to suggest that they aren't telling the

 3   truth?  In other words, will you be telling the jury to believe

 4   everything that they say?

 5        *MR. BACA:*  No, of course not, Your Honor, but we won't

 6   be saying in every instance they -- we won't be saying --

 7        *THE COURT:*  In one instance will you be saying that

 8   their testimony is absolutely not true?

 9        *MR. BACA:*  Absolutely, but I don't think that one

10   instance gets you to a character --

11        *THE COURT:*  Yeah, it does.  So it's denied as to that.

12        *MR. BACA:*  Okay.

13        *THE COURT:*  Your distinction about general character

14   is completely unsupported in the record.  So what that means is

15   the following -- but otherwise I grant the motion.

16        So this is the upshot of my ruling, and that is,

17   Mr. Sackett, all of your witnesses that are listed in this

18   motion *in limine*, the only thing that they can testify about is

19   whether or not you have a character for truthfulness or your

20   wife.  That's it.

21        *MR. SACKETT:*  That would be fine, Your Honor.

22        *THE COURT:*  You have to understand that's going to

23   take about five minutes or maybe two minutes.  They can't

24   testify about the fruit stand or the vegetable stand.  They

25   can't testify about anything else.  They can just be asked, you

 1  know, Do you know Mr. Sackett?  Do you know me?

 2          Yup.

 3          Are you familiar with my reputation?

 4          Yup.

 5          Am I truthful?

 6          Yup, that type of thing.  That's it.

 7          *MR. SACKETT:*  I don't understand why they couldn't

 8  give their personal knowledge of it.

 9          *THE COURT:*  Because you didn't disclose them.  You

10  know, your theory about I didn't want to do it because I don't

11  trust them was a really bad choice.  That's not how the

12  American system works.

13          *MR. SACKETT:*  Yes, Your Honor.

14          *THE COURT:*  And that's part of the problem of not

15  having an attorney is that if you don't understand the rules,

16  then bad consequences happen, and this is one of them.  So

17  that's not to say that the two of you can't testify.  And I

18  don't think they are challenging the daughter, right?

19          *MR. BACA:*  Not at all, Your Honor.

20          *THE COURT:*  So your daughter can testify about things

21  and whatever, but, yeah, the other witnesses that are mentioned

22  in the motion, they can testify about your character for

23  truthfulness or Mrs. Sackett's character for truthfulness, but

24  that's it.

25          *MR. SACKETT:*  Your Honor, I don't think that's fair,

27

 1  but I will live with it.  The reason I don't think it's fair is

 2  because the courts of our land is supposed to be simple enough

 3  that a layman can review a rule.  And these motions they put

 4  against me like a layman motion that not even a United States

 5  Supreme Court nominee knew what it was at the moment was

 6  unfair.  But I will live with --

 7           THE COURT:  Mr. Sackett, I have lots of cases, a lot

 8  of cases where the party doesn't have an attorney.  For

 9  instance, prisoner cases, I have a ton of cases where it's a

10  prisoner, a lot of them totally uneducated.  They figure it out

11  and they produce their documents and they do everything and

12  they don't get sanctioned the way that you did.

13           And the problem is that, you know, let's imagine, you

14  know, you've got a new neighbor.  New neighbor comes to you and

15  he has got a farm and he says, you know, I don't know anything

16  about silage.  I got a new silo, but don't know anything about

17  silage, but hey, how hard can it be?  You would probably say,

18  it's hard because you have got to learn a lot of stuff.  You

19  have got to read the manual.  You have got to figure out the

20  equipment you need.  You have got to be concerned about the

21  moisture content of the silage.  I mean, you would be able to

22  talk to them all day about that subject.

23           Well, you have got to invest the time to learn all

24  these rules because all these rules are designed for a fair

25  process.  And especially for the trial, you and your wife need

1   to really know the rules.  You need to know the Rules of

2   Evidence.  You need to know the Rules of Civil Procedure.  You

3   need to know my practice standards because lots of people

4   without attorneys are able in their cases to figure that all

5   out.  And, you know, you need to too; otherwise, bad

6   consequences can happen, okay?

7          Okay.  Motion *in limine* No. 4, this is the motion *in*

8   *limine* to preclude conspiracy theories about plaintiffs'

9   counsel.

10         So, Mr. Sackett, you were doing some of this today.

11  You can only introduce or mention things that you can prove, so

12  you can't be talking about the attorneys because that's just

13  not a subject of -- and the fact that there is some type of

14  conspiracy with the attorneys or try to berate the attorneys

15  because that's not relevant.  What's relevant is whether the

16  plaintiffs can prove their claims, okay?

17         *MR. SACKETT:*  Your Honor, I haven't said a word that I

18  can't prove or back up against this.

19         *THE COURT:*  Well, then you can file -- you can file

20  disciplinary actions against the attorneys, but that's not this

21  case.  This case is not about the attorneys.

22         *MR. SACKETT:*  I understand that.

23         *THE COURT:*  Okay.

24         *MR. SACKETT:*  It surely must be about filing a case in

25  the court.

1     *THE COURT:*  No.  You have to take a look at the jury

2    instructions.  There will be nothing about jurisdiction.

3     *MR. SACKETT:*  About them filing kidnapping charges

4    against me when there was absolutely no truth at all?  The jury

5    can't hear that?

6     *THE COURT:*  No.  If you are talking about claim one,

7    the so-called human trafficking act claim --

8     *MR. SACKETT:*  The jury can't hear that?

9     *THE COURT:*  They can hear that.  That's a claim.  But

10   they can't -- you can't be making remarks about the only reason

11   this happened is because the plaintiffs' lawyers filed this in

12   federal court and blah, blah, blah.  That's not relevant.  It

13   is in federal court and, as you admit, properly in federal

14   court, so that's not anything that's relevant to this case at

15   all.

16    *MR. SACKETT:*  Yes, Your Honor.

17    *THE COURT:*  That's granted.

18    All right.  Let's take a look -- let's now take up

19   plaintiff's motion to allow telephonic testimony.  This is

20   Docket No. 156.

21    So Mr. Baca or Ms. Rodriguez, tell me why you didn't

22   find out about this condition that the witness had.

23    *MR. BACA:*  Yes, Your Honor.  It's simply that we never

24   asked her about her physical ability.

25    *THE COURT:*  Was it apparent?  I mean, you saw her,

 1  right?  Someone saw her.

 2        *MR. BACA:*  We have only ever talked to her on the

 3  phone.  She lives in Rocky Ford, Colorado, which is about a

 4  three-hour drive from here.  We have spoken to her on the

 5  phone.  She said she would be interested in testifying if we

 6  made it to trial and willing.  I think there was probably some

 7  mutual misunderstanding on both sides where maybe she thought

 8  it would be closer, and we just didn't inquire into her

 9  physical ability, and so we learned this, as the motion says,

10  very recently.

11        *THE COURT:*  When?

12        *MR. BACA:*  I think it was about a month ago, Your

13  Honor.  It's in the --

14        *THE COURT:*  I think Ms. Rodriguez said that she had --

15  maybe late December, something like that?

16        *MR. BACA:*  That's right, Your Honor.

17        *THE COURT:*  Mr. Sackett, do you know this witness,

18  Frances Miller?

19        *MR. SACKETT:*  Yes, Your Honor, I know her.  I have

20  coffee with her husband every afternoon about 4:00 o'clock.

21        *THE COURT:*  Oh, you do.  Okay.  And Mr. Sackett, are

22  you aware of Ms. Miller's physical limitations?

23        *MR. SACKETT:*  Yes, Your Honor, I am.  She is very --

24  she is very -- not crippled, but she has a condition that her

25  legs swell up very large and her condition is, in my opinion,

1   is very poor.

2           THE COURT:  Okay.  Do the defendants, Mr. Sackett,

3   oppose this motion?  In other words, what they are asking is

4   that instead of her coming here and sitting in the witness

5   stand, we would hook her up by phone.  You would still be able

6   to ask her questions, but she wouldn't be present in court.

7   You wouldn't be able to look at her while she was testifying.

8           MR. SACKETT:  Your Honor, when I question someone in

9   court, I like to look at them.  I like to look in their eyes to

10  see what my next question is going to be, whether it's the

11  truth or whether it's a lie.  And I can pertineer tell by

12  looking at someone -- I have been doing this for 50 years, not

13  in court, but in my farm with people that work for me.  And I

14  would object to her on the telephone, but that's the only

15  reason I would have is because I want to see her and talk to

16  her in person.  That's all I have to say.  But yes, I know her.

17          THE COURT:  Okay.  And do you recognize her voice?

18          MR. SACKETT:  Your Honor, I never talked to her on the

19  telephone, so really, I wouldn't know whether I would recognize

20  her voice or not.  She works at the community theater and she

21  is a ticket taker there.  And I would probably -- I would

22  probably recognize her voice I would imagine, yes, sir.

23          THE COURT:  Okay.  So how logistically, how would this

24  connection work, Mr. Baca?

25          MR. BACA:  Your Honor, we haven't discussed the exact

 1   details of it, but my understanding is that attorneys can call
 2   in to a number and be connected to the courtroom.  We have done
 3   that in the past.  So we would give her the time that we
 4   expected we would be asking her to testify and ask her to call
 5   in and connect that way.
 6          THE COURT:  What kind of phone does she have, hard
 7   line or a cellphone?
 8          MR. BACA:  She has access to both, Your Honor, or
 9   either if there is a preference.
10          THE COURT:  Okay.  All right.  Here is my ruling on
11   this one, and that is I think that the exception that exists
12   for circumstances where they come up unexpectedly has been
13   satisfied.  I think that plaintiffs have demonstrated that they
14   weren't aware, and you would logically assume that someone
15   would be available if she says that she is willing to be a
16   trial witness.  You wouldn't have any reason to think that she
17   couldn't come.
18          So as a result, I find that there is, in fact, good
19   cause.  I think she has relevant evidence.  I think that they
20   are compelling circumstances because she simply can't travel
21   given her condition even for a relatively short distance.
22          And we don't need to take any additional safeguards
23   because Mr. Sackett believes that he would recognize her voice.
24   He knows her.  Mrs. Sackett perhaps knows her too, but -- so as
25   a result, there is no question about the identity of the

1   particular witness.

2        I do this somewhat reluctantly because I agree with

3   Mr. Sackett, it's -- there is value to looking into someone's

4   eyes and asking questions of the person.  But under the

5   circumstances here, I find that under Rule 43(a) plaintiffs

6   have satisfied the exception, and not to say that Mr. Sackett

7   or Mrs. Sackett won't have the opportunity to ask as many

8   questions as possible of the witness on cross-examination.

9        All right.  Let's take a look at the next exhibit --

10  sorry, next motion that is the motion for leave to allow the

11  expert witness to remain in the courtroom during the trial.

12       So Mr. Baca, as I understand it, the expert has not

13  been exposed to deposition transcripts, hasn't interviewed

14  anyone, wants to sit in the trial and listen.  And then what

15  would the expert witness then do with the information gained by

16  listening to the trial?

17       *MR. BACA:*  So, Your Honor, she would be testifying to

18  her opinion about the factors and the dynamics of human

19  trafficking, our Claim 1, and the ways in which the plaintiffs'

20  testimony would fit that, not offering an opinion on the

21  ultimate question of liability on that claim, but talking

22  about, for example, her knowledge and understanding of debt

23  bondage and the fact that we believe that the testimony will

24  show that our clients were in that type of situation.

25       *THE COURT:*  And will she be testifying about the

1   defense testimony too?  In other words, she will say, And based

2   upon Mr. Sackett's testimony, there wouldn't be -- there is no

3   debt bondage.  There is no this.  There is no that.  There

4   would not be any human trafficking at all.

5        MR. BACA:  We would absolutely like her to hear the

6   defendants' testimony as well.  I think that all the things

7   that we'll hear in the courtroom, their demeanor and

8   questioning of the plaintiffs I think will inform her opinion.

9        THE COURT:  Well, no, but is that what she is going to

10  do too?  It's going to be in the alternative?  Is she going to

11  say, if you believe the plaintiffs, here is what I say.  If you

12  believe the defendants, then there would not be any liability

13  at all or to that effect that there wouldn't be any basis for

14  finding --

15       MR. BACA:  We hadn't considered offering that kind of

16  testimony, Your Honor, because I think everybody would concede

17  that if the jury believes the defendants, that we would not win

18  any of our claims.

19       THE COURT:  Okay.  Now let's talk about her testimony

20  generally.  Isn't she just going to be someone who, you know,

21  listens to all the evidence and then tells the jury what to do

22  as to the first claim?  I mean, who gets to do that?  You get

23  to do that because you're a lawyer.  She is not a lawyer.  As a

24  matter of fact, she doesn't seem to have any expertise

25  regarding Philippine culture.  She has read something, but that

1   doesn't make you an expert.  She doesn't even seem to have any

2   direct knowledge about a lot of the things.

3           In fact, her evidence for many of her different

4   opinions are references to cases which, A, suggest she has no

5   direct knowledge of them; and B, would be highly improper for a

6   witness to be citing court cases as support for her opinions.

7   You can do that, you know, like now when the jury is not

8   present, but, you know, why would that provide any support for

9   opinions that she might offer?

10          *MR. BACA:*  So, Your Honor, she has 10 years of

11  experience interviewing human trafficking victims, and I know

12  she has extensively studied this.  She is a professor who has

13  written on human trafficking and, I think, the patterns that

14  are common that are the sorts of things that the jury might not

15  hear about often sort of out in the world about human

16  trafficking, I think there is a perception --

17          *THE COURT:*  Such as?  Because I think that one

18  question is why can't the jury, having been informed through

19  the jury instructions of the elements, apply the facts that

20  they've heard to those elements and then resolve the claim?

21  Why do they need some expert to tell them about something?

22          *MR. BACA:*  Right.  Because I think, Your Honor, here

23  we are going to see a lot of very subtle psychological

24  coercion.  These are the types of things that are not going to

25  enter into definitions in the jury instructions and again would

36

1    be quite subtle and not the sort of physical human trafficking,

2    sex trafficking, that's the sort of thing that a lot of people

3    bring to the courtroom with them as, you know, something they

4    have heard of in the past.

5         Here we are going to be talking about very nuance

6    trafficking facts in some ways.  And she has been an expert in

7    this for 10 years and she, through her experience, I think, is

8    absolutely qualified and I think would be of great assistance

9    to the jury as well, who again would be coming in with some

10   preconceptions.

11        *THE COURT:*  Here is my ruling.

12        No. 1, I deny the motion in limine.  She can't sit in

13   the courtroom.  No. 2, she can't testify about any facts

14   specific to the plaintiffs.  In other words, she can only

15   testify generally about the following things:  She can testify

16   about common methods that human traffickers use to influence

17   inappropriately the persons being trafficked.  In other words,

18   she can testify about things like withholding immigration

19   documents, threatening to turn them in, you know, that type of

20   thing, because I think that that is outside the common

21   experience of jurors and therefore would be an appropriate

22   subject for expert testimony.

23        But she cannot illustrate any of her opinions by

24   referencing court cases.  She can't do that, not that maybe her

25   knowledge of some court cases wouldn't form some of her

1    background information, but she can't mention any of that in

2    the course of her testimony.

3            She also can't do things like on Page 4 of her report,

4    Subparagraph D, she starts off by saying:  The threat of

5    deportation alone may support a claim of forced labor.  You

6    have to be very careful because that's an ultimate opinion.

7    She may not be intending it as such, but the way she phrased

8    it, it would be interpreted, I think, by the jury as stating an

9    ultimate opinion.

10           But she can testify about some of the vulnerabilities,

11   too, that persons who have come to the United States and who

12   are the victims of trafficking -- you know, why some of those

13   vulnerabilities may be -- may be relevant.  She can testify

14   about that.  She cannot testify because she demonstrates

15   absolutely no expertise in Philippine culture.

16           In fact, she states on many occasions that she really

17   is not an expert on that.  And you have to be careful because

18   she can't try to slip those opinions in by general references,

19   you know.  Like she can't be saying, well, I know that the

20   Mexican culture, they are very superstitious, and trying to

21   lead the jury to the water of the ghost story here.  She has

22   got to be careful about that.

23           So, Mr. Sackett, the upshot of that is that I have

24   limited the expert's testimony.  It's not going to be fact

25   specific to this case.  Do you understand that?

38

1          MR. SACKETT:  Yes, Your Honor, and I also understand a

2     little bit about an expert.

3          THE COURT:  Yeah.

4          MR. SACKETT:  A simple light bulb, it takes 2000 hours

5     of study to be an expert on a light bulb.  And any subjects it

6     takes about 2000 hours study.  And I doubt her being an expert

7     to begin with.  That's all I have to say.

8          THE COURT:  I am allowing her to express some opinions

9     because I think she does have some expertise generally, but not

10    specific to these facts, okay?

11         Any questions about that, Mr. Baca?

12         MR. BACA:  One question just for clarification.

13         THE COURT:  Here is one other thing while I think of

14    it.  You don't have to tender her.  The state court practice is

15    you tender someone as an expert.  I don't believe that that's

16    appropriate under Rule 702 because we don't bless someone with

17    a magic wand.  This is an expert, so he can testify about any

18    opinion.

19         Rather, it's just opinion by opinion.  An expert has

20    to have the qualifications and expertise for each opinion, so

21    that's why you don't have to tender her as an expert.  But, of

22    course, as much as you want you can ask her about her

23    qualifications so the jury knows.

24         Go ahead with your issue.

25         MR. BACA:  Thank you, Your Honor.

1          Just for clarification, so the issue of the threat of

2    deportation, I understand she won't be able to say that alone

3    would make up the elements of trafficking.  But you said she

4    would be able to talk about some of the means used frequently

5    by traffickers.  Would she be able to include threats of

6    deportation on that list of things?

7          *THE COURT:*  Yes.  You know, the types of things that

8    would cause a person who was not physically chained, you know,

9    to the bed or to the equipment or something like that not to

10   just run away or other things like that.  In other words,

11   things which are beyond the ken of an average juror she can

12   talk about.  That's the whole rationale, that if she has some

13   expertise and that would be helpful to the jury.  But things

14   that are obvious that the jury will hear and will be able to

15   tell, she is not allowed to talk about those because there is

16   no reason for expert opinion on that subject.

17         So this will have the effect of limiting her testimony

18   quite a bit.  So if your outline is basically the same, you're

19   probably misinterpreting my order.  If the witness outline is

20   substantially less, then you are probably correctly

21   interpreting it.

22         *MR. BACA:*  Thank you, Your Honor.

23         *THE COURT:*  All right.  Now let's talk about some of

24   the logistics of the trial.

25         Actually, Mr. Baca, I have got some more questions for

 1  you.  This now is about the claims.  So I am going to take a

 2  look at your -- the pretrial order.  I have a few questions

 3  about your claims.  Actually, not the final pretrial order but

 4  rather the complaint.  So the second claim for relief, this was

 5  the Fair Labor Standards Act, you are not pursuing that; is

 6  that correct?

 7          MR. BACA:  That's correct.

 8          THE COURT:  Are you dismissing that?

 9          MR. BACA:  Yes, Your Honor.

10          THE COURT:  Have you filed a motion to dismiss it?

11          MR. BACA:  We have not.  We put it in our motion

12  summary judgment, and I think the Court dismissed it in the

13  recommendation and the order accepting.  I would have to

14  double-check.

15          THE COURT:  I am not sure of that.  If it hasn't been

16  dismissed by Court order, then why don't you file a motion to

17  dismiss that, just so we clean it up.

18          MR. BACA:  Yes, sir.

19          THE COURT:  Your third claim for relief under the

20  Colorado Minimum Wage of Workers Act, does that act cover

21  agricultural work by family members and also domestic work by

22  family members?

23          MR. BACA:  It does, Your Honor.  So a couple points of

24  clarification there.  We won't be seeking damages on the

25  domestic work that Maribel Echon did for the defendant.

1        *THE COURT:*  And that doesn't just include the mother.

2    That's for any domestic work.

3        *MR. BACA:*  For caring for the in-laws, for caring for

4    Conchita Echon and Esmeralda, Sr., which was the bulk, the

5    majority, if not close to the majority of work that Maribel

6    performed.

7        *THE COURT:*  Are you just talking about Maribel?  Are

8    you just talking about plaintiff?

9        *MR. BACA:*  Maribel Echon, yes, Your Honor.

10        *THE COURT:*  So she doesn't have any other claim for

11    just like housecleaning or what about cleaning rental

12    properties?

13        *MR. BACA:*  Well, that we are pursuing damages for.

14        *THE COURT:*  And that's not domestic.

15        *MR. BACA:*  Exactly correct, Your Honor.  The issue of

16    whether we are covered under the Colorado Minimum Wage Act, you

17    look to the Colorado wage order, the cite for that if you would

18    like.  We have in the facts that the Court has deemed

19    established, we have all the predicate facts required for the

20    plaintiffs to be covered by that.  And that would be that the

21    defendants' businesses earned over 50 percent of their annual

22    dollar volume of business by selling to the consuming public,

23    and that would be through their farm market, which they also

24    conceded in their depositions, but it's also a fact that's been

25    established by the Court.

1          And that fact having been established brings us within

2     the Colorado Minimum Wage Order.

3          *THE COURT:*  Is that for the agricultural part of it?

4          *MR. BACA:*  There is no agricultural exception.  There

5     used to be, but there actually is no longer an agricultural

6     exception under Colorado law.  Under federal law, which we are

7     not pursuing, there is an exception for overtime hours.

8          *THE COURT:*  Okay.  Yeah, why don't you do this, and

9     that is within a week of today give me the case law on that or

10    just kind of spell it out for me because I just want to make

11    sure that to the extent there may be some overlapping claims,

12    but some labor that wouldn't be included in one claim but would

13    be included in another, then I have got a clear idea of what

14    you are contending.

15         *MR. BACA:*  Yes, sir.

16         *THE COURT:*  Obviously, supply a copy to defendants as

17    well.

18         *MR. BACA:*  Absolutely, Your Honor.  I also just would

19    flag very briefly we did have Claim 2 dismissed as part of the

20    summary judgment order.  I found the cite for that.  That's in

21    Docket 138 and it's Paragraph 6 of Page 2.

22         *THE COURT:*  Okay, great.  Thank you.

23         So then the same for the Colorado wage claim.  This is

24    the fourth claim for relief.  If you can give me the citations

25    for that as well.  There may not be any type of agricultural

1   exception in there or any type of domestic exception in there,

2   but to the extent that there is, maybe you can spell out in

3   that same briefing that issue, okay?

4         MR. BACA:  Okay.  Thank you.

5         THE COURT:  Then the fifth claim and the sixth claim

6   are the breach of contract claims, and you have indicated that

7   you are willing to stipulate to the minimum.  Would the effect

8   of your stipulating to the minimum be that those claims, there

9   are no jury issues left?

10        MR. BACA:  That's exactly right, Your Honor.  This is

11  an attempt to save time for the jury at the trial.  There would

12  be no issues for the jury left.  All that would remain is

13  damages, and the magistrate judge and the Court through

14  accepting it had established a floor for that claim of

15  approximately $31,000, and we would be willing to stipulate to

16  that as damages.

17        THE COURT:  Okay.  Mr. Sackett, what do you think

18  about that?  In other words, what plaintiffs are saying is that

19  on the fifth claim and the sixth claim, those are the breach of

20  contract claims, the plaintiffs are willing to stipulate to

21  getting the minimum.  Summary judgment has already been

22  entered.  And their theory is that at trial the amount of

23  damages could only go up.  So they are willing to make due with

24  the minimum, and that way those two claims aren't even at

25  issue.

1          Any response on that front?

2          *MR. SACKETT:*  Yes, sir, Your Honor.  When you have

3     been accused of something that you are not guilty of, I don't

4     think there is any going up from here.  I think it's here is

5     the only way to be up.  I don't feel that I -- that they have

6     any right or anything whatsoever to start at $30,000 up.  That

7     is absolutely -- if you're guilty, then that's a different

8     thing.  But if you are innocent and you are proven innocent by

9     a jury, that's what I think.  And that is what I am going to

10    think today, tomorrow, and the day they put me in the grave.

11    That's the same thing I am going to think.

12          *THE COURT:*  Okay.  Yeah, I don't see any remaining

13    jury issue on the breach of contract claims because summary

14    judgment has already been entered.  So that doesn't mean that

15    the defendants can't appeal.  You can appeal.  And, you know,

16    if you disagree with that entry of judgment, that can be argued

17    in front of the 10th Circuit, but I don't see a jury issue.  So

18    as long as the plaintiffs stipulate, and I consider them having

19    done so on the record, then I don't think that the fifth and

20    sixth claims are at issue at trial.

21          So, Mr. Baca, seventh claim, unjust enrichment, I know

22    that you say that this is in the alternative, but what

23    different sort of damages could you receive through the seventh

24    claim?

25          *MR. BACA:*  Your Honor, I think because it's in the

 1    alternative, I don't think there is a different universe of

 2    damages that we could get through Claim 7.  The way that that's

 3    relevant is if for whatever reason the jury does not believe

 4    that the plaintiffs were employees and so fall outside of the

 5    Colorado Wage Claim Act, but they believe they did some work

 6    for the defendants, that should be compensable.

 7         THE COURT:  Okay.  Yeah, I am going to -- I

 8    understand.  And then you mention a couple of times penalties,

 9    that you are asking for penalties.  Who would give you the

10    penalties?

11         MR. BACA:  Your Honor, this is an area where the case

12    law is not as clear as we would like it to be, but the way that

13    we believe the case should proceed is that the jury makes the

14    requisite findings, and then the Court, as a matter of law,

15    awards the penalties once the facts have been established.

16         THE COURT:  Okay.  Why don't -- if you have case law

17    on that, I would appreciate that.  That could be true,

18    especially if there was some factual predicate that a jury

19    could determine, or alternatively it could be an issue that the

20    factual predicate has to be established by the Court.  The

21    Court would need to make that finding, too.  Yeah, penalties

22    is -- I agree with you, you never know about the law on

23    penalties.  It can be somewhat confusing.

24         MR. BACA:  You are saying you would want briefing on

25    that?

 1          *THE COURT:*  On the penalty issue.  Here is the issue.

 2    Why should be the jury be informed anything about penalties?

 3          *MR. BACA:*  And the reason, as we have it laid out in

 4    the jury instructions right now, is we do believe that the jury

 5    has to make the factual predicate finding.

 6          *THE COURT:*  Yeah.  You know, once again, let's assume

 7    that's true.  I wonder whether the jury would need to be told

 8    why it's making those predicate findings because, once again,

 9    maybe a jury wouldn't feel this way, but, you know, juries

10    don't impose penalties.  So that's why it would seem to me that

11    the jury should not be told that you're entitled to penalties.

12    But if there is a factual -- if we need to add a question to

13    the verdict form, that may be appropriate.

14          *MR. BACA:*  In our proposed verdict form, we do have

15    two questions that go to the penalties.  The first is whether

16    defendants' non-payment of the plaintiffs was willful and

17    that's a requirement.  And the other is when the plaintiffs

18    left their employment with defendants and how soon that was in

19    relation to the demand letter we sent.

20          So there might be a way we could just simply ask those

21    questions.  I think the jury -- there is some chance of jury

22    confusion about why they have to check a box about willfulness

23    if there is not an instruction explaining why that is.

24          *THE COURT:*  And especially, I mean, you wouldn't

25    otherwise introduce the demand letter, would you?

1          MR. BACA:  I don't think we would have any reason

2     other than the penalties, no.

3          THE COURT:  That's why I am skeptical of that.  But if

4     you think that it needs to be -- a jury finding somehow refers

5     to the demand letter, then make your best case on that.

6          MR. BACA:  Okay.

7          THE COURT:  Those are all the questions I had.  So now

8     let's go to the logistics of the trial.

9          So on January -- first day of trial, February 12,

10    everyone should be here right on time at 8:00, so 8:00 a.m.

11    Come at 8:00 a.m. and we will talk about any remaining issues.

12    For instance, we will talk about any tools, Mr. Sackett, that

13    you brought in that you wanted to use for demonstrative

14    exhibits.  We will talk about any questions that you may have.

15         I don't want any surprises, so if there is some big

16    legal issue that's going to take a long time to figure out, you

17    need to bring that to my attention earlier than the first day

18    of trial.  Otherwise, we will get a late start, and you don't

19    have that much time, so you need to do that.

20         Then what will happen is I'll take a recess and then

21    Ms. Grimm will bring in the prospective jurors.  So the

22    prospective yours will be arriving very early.  And based upon

23    who shows up, the clerk's office will prepare a list of those

24    persons random.  They will just be in random order.

25         The first person on that list will be seated in the

 1    chair back row nearest the bench.  That's seat No. 1.  And then

 2    the next eight people will be seated in order across the back

 3    row.  The ninth person on the list will be seated in the first

 4    chair first row closest to the bench.  And then we'll seat up

 5    to the 15th person, okay?  So one chair in the jury box will be

 6    empty.  Why?  Because each side -- I use nine persons for a

 7    civil trial.  The jury will consist of nine persons.

 8            Each side has three peremptory challenges, so you can

 9    excuse three people.  So 15 minus six equals nine, so that's

10    why we have 15 people up there.  If someone was excused for

11    cause, then the 16th person on the list would be the person who

12    would fill in the first excused person's seat.  So let's assume

13    that the person in the second seat back row had a vacation,

14    tickets for the next day, and was excused.  Then the 16th

15    person on the list would be -- would take that seat.

16            Then when you exercise your peremptory challenges --

17    so your peremptory challenges are ones that you don't have to

18    give a reason for.  If you just talking between yourselves, you

19    decide I don't think that person would be such a great juror.

20    I am going to excuse them, the process works that first

21    plaintiffs would go.  And I would say, Plaintiffs may exercise

22    their first peremptory challenge.  Someone will stand up, and

23    it will all be done orally, say, We thank and excuse, for

24    instance, Ms. Jones, and then that juror would be excused.

25            Then I would ask the defendants to exercise their

```
 1    first peremptory challenge.  And they would do the same thing,

 2    stand up and thank and excuse one of the jurors.  That person

 3    would then be -- would leave the courtroom, and then plaintiffs

 4    would exercise their second and go like that just back and

 5    forth, okay?

 6              Any questions about that process, Mr. Baca?

 7              MR. BACA:  No questions, Your Honor.

 8              THE COURT:  Any question by defendants as to that

 9    process?

10              MR. SACKETT:  No, Your Honor.

11              THE COURT:  Thank you.

12              The other thing I would like for you to do, now we are

13    going to talk about asking questions of the prospective jurors,

14    what they call by the old French term voir dire.  So what I'll

15    do at the beginning of our jury selection process is I will --

16    first of all, I will ask each side to introduce themselves.  At

17    that time I will have plaintiffs introduce themselves, and

18    usually one of the attorneys or both attorneys introduce the

19    clients.

20              And then I will ask the Sacketts to introduce

21    themselves, and you can both stand up and just state who you

22    are.  Then after that, then I'll go ahead and read a list of

23    the witnesses that both sides intend to call, all right?  So if

24    you want, you can each read your own list or I can combine the

25    two lists and put them in alphabetical order and I'll read it.
```

50

1        Any preference, Mr. Baca?

2        *MR. BACA:*  I think having the Court read it would be

3    helpful.

4        *THE COURT:*  Mr. Sackett, any preference by defendants?

5        *MR. SACKETT:*  No, Your Honor.

6        *THE COURT:*  So, Mr. Sackett, what you'll need to do,

7    then, is give me a list of who your witnesses are going to be,

8    keeping in mind my ruling about you can only call those

9    witnesses listed in the motion *in limine* who are going to

10   testify about your character for truthfulness, okay?

11       *MR. SACKETT:*  Yes, Your Honor.

12       *THE COURT:*  So I want you to mail that list to me by

13   next week.

14       *MR. SACKETT:*  Yes, Your Honor.

15       *THE COURT:*  Great.  And then I'll combine the lists

16   and I'll put them in alphabetical order.

17        Then I am going to be asking the prospective jurors

18   basic background questions like what their job is, their job

19   history 10 years back, that type of thing.  I will ask them

20   about their -- whether they are married; if they have a spouse

21   who is working, what their spouse does; if they have working

22   age children, whether their children are working; if so, what

23   they do.  I'll ask them about their hobbies.  If anyone

24   mentions that they do agricultural labor, I'll ask them

25   questions about that, save you guys some time, things that may

 1   be of interest to both sides.

 2          Once I am done with that, I think you will have a

 3   pretty good idea of their background.  Then I will turn it over

 4   to each side, and then each side will have 15 minutes to ask

 5   questions, okay?

 6          So let's take a look at the questions that plaintiffs

 7   have proposed.  Question No. 3, lawsuits, I'll be asking that,

 8   but you can ask it if -- as follow-up or anything that you

 9   wish.

10          Question No. 7(c), As a business owner, it might be

11   natural to sympathize.  Two problems with that question.

12   No. 1, you can't preface any question with a fact statement or

13   any type of statement.  So I am not going to allow you to ask

14   that question, but you can certainly ask whether -- and I

15   think -- well, I am not sure you do -- you can certainly

16   mention the fact that you anticipate that the Court will give

17   an instruction that sympathy can't be a reason for your

18   verdict.  You can mention that and then ask people if they can

19   follow that instruction.  That's okay.

20          And also Question No. 8, too many lawsuits, I am not

21   going to allow you to ask that.

22          Question No. 9, two problems.  No. 1, it has a

23   preface.  You can't -- no question, and you have to listen to

24   this, you can't give the jurors any facts about the case when

25   you are asking the jurors questions.  You can't do it.  So you

1    can't ask them a fact-directed question.  But second of all,

2    the instructions will give the jury enough information about

3    that, so I won't allow question No. 9.  Same as for 10 and 11,

4    I won't allow you to ask that question.

5         Question No. 12 talks about the burden of proof.  I am

6    not going to allow you to talk about tipping the scales, but

7    you can ask -- indicate to the jury that you anticipate the

8    Court will give them a preliminary instruction on the burden of

9    proof.  And you can quote from that and then ask them if they

10   can follow that instruction.  That's okay.

11        Question No. 14, that has a preface, but that's okay.

12   I am going to except -- make an exception for that because I

13   think it's important that the jury understands that there is

14   going to be interpreters here and the reason why there is going

15   to be interpreters and whether jurors would have an issue with

16   their use of interpreters, okay?

17        One thing, Mr. Baca, that I wanted to mention to you

18   and that is the following.  When one of the plaintiffs

19   testifies, you'll probably need two interpreters or otherwise,

20   you know, the people at the table won't really be getting the

21   simultaneous translation.

22        *MR. BACA:*  That was our understanding also, Your

23   Honor.  We will have two interpreters present.

24        *THE COURT:*  Yeah, great.  I just wanted to

25   double-check with you on that.

```
1              So those are my comments on those.

2              So Mr. Sackett, when you or Mrs. Sackett are asking

3   the jurors questions, you didn't give me any proposed

4   questions, but you can certainly ask any follow-up questions

5   that, you know, one of the jurors talked about.  You can follow

6   up on any of the answers that they have given.  That's

7   perfectly fine, okay?

8              MR. SACKETT:  Yes, Your Honor.  I only had one

9   question and I didn't put it in.  It was very -- my answers to

10  all the questions is very simple and in very few words, but I

11  thought maybe I might ask, Has any of you ever been in the

12  Philippines?

13             THE COURT:  Yeah, that's a good question.  You can ask

14  that.

15             MR. SACKETT:  That was the only question on that, sir.

16             THE COURT:  That's a good question.  You can ask that.

17             Okay.  Next topic.  So Mr. Baca, how much time do

18  plaintiffs request for opening statements?

19             MR. BACA:  I think 30 minutes, Your Honor.  I don't

20  think we will use all of it, but I think 30 minutes would be

21  adequate.

22             THE COURT:  Mr. Sackett, how long do defendants ask

23  for their opening statement?

24             MR. SACKETT:  Your Honor, I am a person of very few

25  words.  My opening statement probably won't take me about 15
```

1   minutes at the very most.

2          *THE COURT:*  That's fine.  I will allow up to 30, but

3   hopefully it can be shorter because you're time jammed as it

4   is.  The longer the openings, the less time there is for

5   testimony.

6          And Mr. Sackett, just so you understand, the opening

7   statement is not opening argument.  So what you would do is you

8   would indicate to the jury what you anticipate your evidence

9   would be, but it wouldn't be arguing -- it won't be like a

10  closing argument, just what you anticipate your evidence will

11  be, okay?

12         *MR. SACKETT:*  Yes, Your Honor.  I understand that.

13         *THE COURT:*  And you can end by saying, And in the end

14  we will be asking you to find that we are not liable for

15  anything.  That's okay, but it can't be like an argument.

16         Okay.  And after we finish with the openings, then we

17  will have the start of the testimony.  So plaintiff will go

18  first and then after a witness testifies, then I will ask

19  defendants if they have any cross-examination.  And then,

20  Mr. Sackett, I just want to make sure that you understand,

21  anything that you or Mrs. Sackett says from the podium is not

22  evidence.  I will be telling the jury that time after time

23  because when you are making a statement from the podium as

24  opposed to the witness chair, that's just a statement of an

25  attorney or a party.  It's not evidence.

1                So you can't testify from the podium.  So when you are

2      asking a witness questions, you can't make statements to them.

3      You can't say, I never did that.

4                You understand?

5                MR. SACKETT:  Yes, Your Honor.

6                THE COURT:  But, of course, if you are called by the

7      plaintiffs, for instance, as a witness or if you choose to

8      testify or Mrs. Sackett chooses to testify, then you would take

9      the witness stand.  You would be sworn to tell the truth.  And

10     then at that time you can go ahead and testify, but I just want

11     to make sure that you understood that you can't be making

12     statements.

13               MR. SACKETT:  I understand that, Your Honor.

14               THE COURT:  Okay, good.  Thank you.

15               All right.  So I am not going to, for instance, keep

16     you on a clock, but I am going to be keeping track of the time

17     because we will finish on time.  It's a three-day trial and we

18     will end it on time.  So if to do that I have to limit the

19     length of certain witnesses, limit testimony, that will happen.

20     So plaintiffs need to run a tight ship, a really tight ship,

21     because the Sacketts have a right to present evidence, of

22     course, too, and have enough time to do so.

23               MR. BACA:  Can I ask a question about that?

24               THE COURT:  Yeah.

25               MR. BACA:  Will there be an indication that we are

1    about to run out of time?  Is there --

2           THE COURT:  We will talk about that as the trial goes

3    on because the problem is I don't quite know how much time the

4    defense case will take.  So it's really -- it's kind of a wild

5    card.  I mean, I could just divide everything in half, but my

6    prediction is that, you know, that would limit you too much and

7    we would finish early, but you will have to be running a tight

8    ship so that I know by the time you rest that the Sacketts have

9    sufficient amount of time to present their case.

10          MR. BACA:  Okay.  Thank you.

11          MR. SACKETT:  Your Honor --

12          THE COURT:  Yes.

13          MR. SACKETT:  My questions to the jury will be -- or

14   to the witnesses will be quite short and quite easy to answer,

15   so time, I think we will get along real well on time.

16          THE COURT:  Okay.  Yeah, I think we will be fine too.

17   I just want to make sure that we don't short-change you.

18          MR. SACKETT:  No, my questions will be short and easy

19   to answer.

20          THE COURT:  How long, if you know, Mr. Sackett, how

21   long do you think your testimony will take?  Do you know?

22          MR. SACKETT:  Well, my testimony, it depends upon how

23   many questions someone asks me.

24          THE COURT:  How about when you testify on your own, do

25   you anticipate calling yourself as a witness?

1          MR. SACKETT:  Maybe 30 minutes, I would say.

2          THE COURT:  Yeah, thanks.

3          Any request for sequestration?

4          MR. BACA:  Yes, Your Honor.  We request that.

5          THE COURT:  So Mr. Sackett, what that means is that

6    your witnesses will not be allowed in the courtroom.  You, of

7    course, are parties.  You can stay in the courtroom.  But, for

8    instance, your daughter, she will have to stay in one of the

9    rooms right outside of the courtroom until she is called.  When

10   she is called, then she will come in and testify and then she

11   has to go back out.  Same with all your witnesses, all right?

12          And make sure that you indicate to your witnesses that

13   they have to be very careful about not talking about the case

14   anywhere in the building to make sure that one of the jurors or

15   another witness doesn't overhear them.  They have to be real

16   careful about that.

17          MR. SACKETT:  Yes, I understand that.  I will be

18   really careful with them.  I know they will be very careful.

19          THE COURT:  I am sure they will.  Great.  Thank you.

20          Also when you're examining a witness, you should refer

21   to that witness by his or her last name.  I think we will

22   probably need to -- I don't know, how old is Justin?

23          MR. BACA:  24, Your Honor.

24          THE COURT:  So he is an adult.  Yeah, you should refer

25   to him by Mr. Echon.  Is that how it's pronounced?

1          *MR. BACA:*  That's right, Your Honor, Echon.

2          *THE COURT:*  So you should refer to him that way, but

3    the witnesses don't.  The witnesses can talk about each other

4    whatever way they talk about each other.  So if they call each

5    other mom, dad, Justin, that's fine, but you can't use informal

6    ways of addressing witnesses as a way to kind of make them seem

7    more cuddly or something.  That's not true when the Sacketts --

8    like, for instance, if Mr. Sackett called Mrs. Sackett to the

9    witness stand, he wouldn't have to call her Mrs. Sackett.  You

10   can call her by her first name.  Otherwise, it would just be

11   way too awkward.  On the other hand, she can get up on the

12   witness stand and testify and answer questions too.  That's

13   fine, but there would be an exception there.

14          Make sure that the parties, and this will include the

15   Sacketts, that you maintain a poker face during the trial.  So

16   you're doing a really good job of it today, but you shouldn't

17   be reacting with, you know, horror when someone says something

18   you don't like or laughing it up if one of your witnesses

19   cracks a joke, that type of thing, because if it looks like you

20   are trying to influence the jury, that would be inappropriate.

21          Let's talk about one other aspect of the testimony,

22   and that is are plaintiffs intending to introduce evidence

23   about Mrs. Sackett's improper care or failure to care for her

24   mother?

25          *MR. BACA:*  We are, Your Honor, not necessarily that

1    she was improperly caring for them herself, but that she was

2    requiring Maribel to care for them.

3           THE COURT:  Why would that be relevant, because No. 1,

4    now you are not seeking any monetary relief for those hours.

5           MR. BACA:  It's important, Your Honor, for a number of

6    reasons.  The main one is this atmosphere of control that she

7    exercised over each individual member of the family.  And the

8    only reason she wasn't working more on the farm and in the

9    market is because she was assigned to a different job, which

10   she was not able to turn down, she was not able to say no to.

11          THE COURT:  I am going to exclude that.  I think it's

12   403.  Evidence that she didn't properly care for her own mother

13   is -- has a -- I think would have a greatly prejudicial effect

14   that would overwhelm any potential relevance, particularly

15   since there is no claim for the compensation for those

16   particular wages.

17          MR. BACA:  Would we still, Your Honor, be able to

18   introduce evidence that Maribel Echon was caring for the family

19   members, that she was required to do so, that that was a

20   prerequisite of her?

21          THE COURT:  You can do that generally, I think that's

22   fine, but I particularly don't want any testimony whatsoever

23   that she was improperly caring for her mother.

24          MR. BACA:  Okay.  Thank you, Your Honor.

25          There might be some aspects of that that would be -- I

1    don't know if at the trial might be the time to discuss it or

2    now.  So, for example, Ms. Sackett was receiving government

3    money for the care of her parents, but Maribel Echon was the

4    one doing the work.  And government witnesses will be here to

5    testify.

6              THE COURT:  Why is that relevant?

7              MR. BACA:  Again, Your Honor, this is the

8    exploitation, the coercion that is --

9              THE COURT:  Yeah, but why does it have any bearing on

10   the first claim?

11             MR. BACA:  Because, Your Honor, she didn't have a

12   choice but to continue to work without pay.  And somebody

13   was --

14             THE COURT:  Yeah, that's one thing, but it's another

15   thing if she is receiving money and she is not giving it to the

16   caretaker.  That may be a criminal offense or that may be

17   something else, but why is it relevant to the first claim?

18             MR. BACA:  I think a lot of this case, Your Honor,

19   hinges on the totality, the atmosphere that was created by the

20   defendants towards the plaintiffs.  And that's about, you know,

21   what they thought they could do and not do.  They believed that

22   they had no choice but to do what they were told and didn't

23   know that they were getting exploited at first, that there was

24   money being made, for example, on the work --

25             THE COURT:  If they didn't know about it, why is it

1   relevant?

2           *MR. BACA:*  Well, they did actually become aware of it.

3           *THE COURT:*  When?

4           *MR. BACA:*  I'm not sure exactly when, when they became

5   aware of it, but they did become aware, sought assistance.  The

6   government witnesses will testify that there was not enough

7   food in the house, which was part of the coercion, was part of

8   this.

9           *THE COURT:*  Yeah, that's okay, but nothing -- I am

10  also excluding any testimony about her receiving benefits

11  because I don't see any relevance to that.  That's just an

12  attempt, it seems like, just an attempt to make the defendants

13  look bad, but it doesn't seem to be relevant to any claim in

14  the case.

15          *MR. BACA:*  The other place I would say it would be

16  relevant, Your Honor, would be our unjust enrichment claim.  I

17  think that's about as clear an example as you can get whether

18  the defendants were benefiting from the plaintiffs in a way

19  that was never -- the plaintiffs were never compensated for.

20          *THE COURT:*  How would that change the dollar figure,

21  if any, awarded on that claim?  I mean, what would be the

22  measure of damages?

23          *MR. BACA:*  Well, I think on that specific claim, I

24  think that would be a very good -- very good evidence of what

25  damages for unjust enrichment would be the amount that

1    Ms. Sackett was able to take home every month from Maribel

2    Echon's labor.  I think that would be a pretty clear way to

3    measure it.

4          THE COURT:  Well, wouldn't that be like a really

5    inadequate way to measure it?

6          MR. BACA:  Well, it's one of the pieces.  It wouldn't

7    be the whole thing.

8          THE COURT:  If you are asking for the fair value of

9    the labor, which would be far greater than whatever federal

10   assistance or whatever that the government fund was, why would

11   it have any bearing on it?  If it's not a measure, then why is

12   it relevant?

13         MR. BACA:  The other way it's relevant, defendants are

14   going to claim they were giving plaintiffs free room and board

15   for the entire time that plaintiffs lived there.  And it was

16   anything but free and certainly not adequate, which was a

17   different question, but there was always a *quid pro quo* with

18   the room and board, and that's another piece of it.  In other

19   words, Your Honor, this question is inseparable from a number

20   of facts that are highly relevant to this case.  From the room

21   and board --

22         THE COURT:  I don't understand the room and board.  I

23   mean, the room and board it seems is totally independent and,

24   you know, legitimate evidence, but I don't see the relationship

25   to some kind of --

1           *MR. BACA:*  The government assistance was paying the

2    rent for the house.  So Ms. Sackett was charging her parents

3    room and board, which the government checks were provided, and

4    then here in the case the defendants are going to say we

5    provided room and board to the plaintiffs the entire time,

6    whereas that amount is accounted for entirely by the government

7    assistance.

8           *THE COURT:*  Okay.  So Conchita is living in one of the

9    rental properties?

10          *MR. BACA:*  That's right, the whole family, they were

11   all living there.

12          *THE COURT:*  And the rent -- sorry, the government

13   assistance paid for the rent?

14          *MR. BACA:*  Yes, sir, for the entire house.

15          *THE COURT:*  For the entire house.  Were there

16   regulations that said you couldn't have anyone else living

17   there?

18          *MR. BACA:*  I am not aware of any such regulations, but

19   it's this issue of double-counting to the extent they want to

20   deduct from wages the room and board that they provided to the

21   plaintiffs.

22          *THE COURT:*  Okay.  Here is my ruling on that.  If the

23   Sacketts raise the issue, then you can use that as rebuttal

24   evidence, but not until, okay?

25              All right.  Let's talk about exhibits.  Make sure that

1   you don't have any duplicates among your exhibits.  Do

2   plaintiffs intend to use some type of technology to display

3   exhibits?

4        *MR. BACA:*  Yes, Your Honor, we would like to put it up

5   on the screen.  So we know there is a technology class which we

6   haven't taken yet.

7        *THE COURT:*  You are going to use the Elmo?

8        *MR. BACA:*  I don't know if it will be the Elmo or we

9   can digitally display it.

10        *THE COURT:*  You need some kind of software to

11   digitally display something otherwise.  But in any event, if

12   you do that, make sure that you do understand if you are going

13   to use some type of trial presentation software, like Sanction

14   or something, make sure that you have it loaded up.  Don't just

15   come in here, like listen to the class, whatever it is; but

16   make sure you have it on your computer, come in with the

17   connections, plug it in, see if it actually works, that type of

18   thing.

19        Mr. Sackett, Mrs. Sackett, you might want to schedule

20   some time to come in because there is a fancy overhead

21   projector and that overhead projector will display things.  If

22   you had like an exhibit, it will display things.

23        And Ms. Grimm, could you demonstrate the -- pull out

24   one of the monitors in the jury box?

25        So you can see there are monitors between every other

1   chair, and as a result, if something is admitted, it can then

2   be displayed to the jury.  You should use that instead of

3   posters.  Posters don't work well.  That works great.

4          So Mr. Sackett, if you are interested in using that

5   too -- you don't have to, but if you were, just ask Ms. Grimm

6   after this hearing to set up a time to come in and try to

7   practice with that overhead.

8          *MR. SACKETT:*  Okay, Your Honor.

9          *THE COURT:*  And then if you have multi-page exhibits,

10  make sure that each page bears a consecutive number.  It

11  doesn't have to start with one, but otherwise the witnesses

12  won't really know what page to turn to.  So the best way to do

13  that if the pages don't otherwise have consecutive numbering is

14  to just take a pen out and mark first the one 1, second one 2,

15  so forth and so on.

16         All right.  I don't have any other questions.  We will

17  probably meet after either the first day after 5:00 o'clock or

18  the second day to talk about the jury instructions.  So don't

19  plan on leaving right at 5:00.  We might need to talk about

20  jury instructions.

21         That's all the topics I have.

22         Mr. Baca, anything else on behalf of the plaintiff?

23         *MR. BACA:*  One item, Your Honor.  That would be the

24  admission of our exhibits.  We would like to, for the Court, we

25  would like to move the admission of all of our exhibits at the

1   start of evidence.

2       *THE COURT:*  It's a reasonable request.  The problem is

3   that most attorneys don't do that and I am not going to hold

4   the defendants to it either.  You are going to have to move the

5   admission of them.

6       *MR. BACA:*  Okay.  So you are saying most attorneys

7   don't --

8       *THE COURT:*  Most attorneys are oblivious to that rule.

9   You are right, though, but because the Sacketts are pro se, I

10  am just not going to hold them to that.  I am not going to deem

11  their objections waived.

12      *MR. BACA:*  We will then go through each one with the

13  witness in the sort of traditional way.

14      *THE COURT:*  Traditional way, I think that's fair.

15  Otherwise -- and I don't know if you necessarily want to do

16  that anyway.

17          Anything else, Mr. Baca?

18      *MR. BACA:*  Nothing from plaintiffs, Your Honor.

19      *THE COURT:*  Mr. Sackett, anything else on behalf of

20  you and your wife?

21      *MR. SACKETT:*  Your Honor, the only other thing I would

22  like to do, whenever the jury is seated, I would like to have a

23  short prayer.

24      *THE COURT:*  We don't do that.

25      *MR. SACKETT:*  One minute or so long.

1          *THE COURT:*  No, we don't do that, because on the

2    whole, we keep religion out of it.  I don't ask anyone about

3    their religious beliefs and, yeah, we just don't do it.  It's

4    kind of a separation of church and state thing, so we won't do

5    that.

6          *MR. SACKETT:*  Okay, Your Honor.

7          *THE COURT:*  All right.  Then I'll see you all on

8    8:00 a.m. February 12.  The Court will be in recess.  Thank

9    you.

10       (Recess at 3:38 p.m.)

11                     REPORTER'S CERTIFICATE

12       I certify that the foregoing is a correct transcript from

13    the record of proceedings in the above-entitled matter.  Dated

14    at Denver, Colorado, this 22nd day of June, 2018.

15

16                              S/Janet M. Coppock

17

18

19

20

21

22

23

24

25